# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, by and through the
KANSAS DEPARTMENT FOR CHILDREN
AND FAMILIES,

      **Plaintiff,**

**v.**

**Case No. 15-cv-04907-DDC-KGS**

UNITED STATES, by and through
HONORABLE ASHTON B. CARTER,
Secretary of Defense, and HONORABLE
PATRICK J. MURPHY[1], Secretary of the
Army,

      **Defendant.**

## MEMORANDUM AND ORDER

This matter comes before the Court following an abridged Order (Doc. 26) granting a

Motion for Preliminary Injunction (Doc. 17) filed by plaintiff State of Kansas, through the

Kansas Department for Children and Families ("Kansas").  Defendant United States, through the

Honorable Ashton B. Carter, Secretary of Defense, and the Honorable Patrick J. Murphy,

Secretary of the Army (collectively, "the Army") opposed the preliminary injunction.  Doc. 20.

And, on February 23, 2016, the Court conducted a hearing on Kansas' motion for preliminary

injunction.  After considering the evidence and arguments filed with the Court and presented at

the preliminary injunction hearing, the Court issued an abridged Order.  It preliminarily enjoined

the Army from:

> conducting any procurement, including making any award of contract in connection with
> cafeteria services at Fort Riley, except as permitted under the RSA and its regulations,

---

[1] The case caption has been updated to reflect that Patrick J. Murphy replaced John McHugh as the
Acting Secretary of the Army in November, 2015.  *See* Fed. R. Civ. P. 25(d)(explaining that the successor
of a public officer is substituted automatically as a party).

until such time as the arbitration proceeding initiated by Kansas under the RSA is concluded, or further order modifying this preliminary injunction.

*See* Doc. 26.  Because time was of the essence, the Court ruled on the preliminary injunction in a summary fashion.  The Court also informed the parties that a future order would expand upon the Court's reasoning.  This Order supplements the Court's initial preliminary injunction decision.

This Order also addresses three related motions: (1) the Army's Motion to Dismiss (Doc. 7); (2) the Army's Motion to Strike Plaintiff's Surreply to Defendant's Motion to Dismiss (Doc. 15); and (3) Kansas' Motion for Leave to File First Amended Complaint for Preliminary Injunction (Doc. 16).

## I.      Background

### A.     The Randolph-Sheppard Vending Facility Act and the Javits-Wagner-O'Day Act

The Randolph-Sheppard Vending Facility Act of 1936 (the "RSA"), 20 U.S.C. § 107 *et seq.*, mandates preferential hiring for blind persons in the carrying out of vending services at federal facilities.  The RSA's purpose is to "provid[e] blind persons with remunerative employment" and "enlarg[e] the economic opportunities of the blind" by giving them priority in the bidding of contracts to operate vending facilities on federal properties.  20 U.S.C. § 107.  Vending facilities include cafeterias on military bases.  *See* 20 U.S.C. § 107(e)(7); *Kentucky v. United States*, 759 F.3d 588, 592 (6th Cir. 2014).

Although the RSA applies to all federal agencies, the Secretary of the United States Department of Education ("DOE") is charged with interpreting, enforcing, and resolving disputes arising under the RSA.  *See* 20 U.S.C. §§ 107(b), 107a, 107d-1.  The RSA's implementing regulations are codified in 34 C.F.R. §§ 395.1–395.38.

To grant priority to blind vendors under the RSA, the Secretary designates a State Licensing Agency in each state "to issue licenses to blind persons . . . for the operating of vending facilities" on federal property.  20 U.S.C. § 107a(a)(5).  Then, when a federal agency solicits vending-facility services, it either may negotiate a contract directly with the State Licensing Agency or it may solicit competitive bids for the contract.  *See* 34 C.F.R. § 395.33(b), (d).  When the federal agency solicits bids, it must invite the State Licensing Agency to bid on the contract.  *See* 20 U.S.C. § 107a(a)(5); 34 C.F.R. § 395.33(b).  The State Licensing Agency then selects a licensed blind vendor and submits a bid.  *See* 34 C.F.R. § 395.33(b); *Kentucky*, 759 F.3d at 592.  In a competitive procurement solicitation, if the State Licensing Agency and blind vendor's bid is "within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award," the federal agency must give priority to the licensed blind vendor selected by the State Licensing Agency.  34 C.F.R. § 395.33(a)–(b).

If a dispute arises between the State Licensing Agency and the federal agency who has solicited vending-facility services, the RSA provides for arbitration of the dispute.  *See* 20 U.S.C. § 107d-1(b); 34 C.F.R. §§ 395.33(b), 395.37.  The State Licensing Agency may file a complaint with the Secretary of the DOE whenever it "determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply" with the RSA or regulations issued under it.  20 U.S.C. § 107d-1(b); 34 C.F.R. § 395.37.  After the State Licensing Agency has filed a complaint with the DOE's Secretary, the "Secretary . . . shall convene a panel to arbitrate the dispute . . . and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter."  *Id.*; *see also* 20 U.S.C. § 107d-2(a) ("Upon receipt of a

complaint . . . the Secretary shall convene an ad hoc arbitration panel as provided in subsection (b) of this section.  Such panel shall . . . give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5.").

The RSA, however, is not the only federal act that applies to services provided on federal properties.  The Javits-Wagner-O'Day Act (the "JWOD"), 41 U.S.C. § 8501 *et seq.*, established a Committee for Purchase from People Who are Blind or Severely Disabled ("the CFP").  41 U.S.C. § 8502.  The CFP "maintain[s] and publish[es] in the Federal Register a procurement list" (the "Procurement List").  41 U.S.C. § 8503.  The CFP determines suitable products and services to place on the Procurement List and, once placed on the list, federal government entities must procure those products and services from qualified organizations that employ the blind and severely disabled.  §§ 8501(6), (7), 8503, 8504.  The CFP also establishes the prices for the products and services on the Procurement List and establishes rules and regulations to implement the program.  *See* 48 C.F.R. § 8.702.  The JWOD's implementing regulations are codified in 41 C.F.R. §§ 51-1.1–51-10.999.  The procurement program established by the JWOD to provide employment opportunities to the blind and severely disabled was renamed the "AbilityOne Program" in 2006.  71 Fed. Reg. 68492.  And the CFP now is known by its operating name, "AbilityOne Commission."

The AbilityOne Commission works with two central nonprofit agencies to administer the AbilityOne Program—National Industries for the Blind and SourceAmerica.  SourceAmerica helps implement the AbilityOne Program for the significantly disabled.  The National Industries for the Blind helps implement the AbilityOne Program for the blind.  When a nonprofit agency such as SourceAmerica identifies a possible service to add to the Procurement List, it puts

together a proposal for the AbilityOne Commission to consider.  And if the Commission

determines that the service is suitable to add to the Procurement List, it publishes a notice of its

intent to do so in the Federal Register.  The public then has 30 days to comment on the proposed

addition, and, after considering any public comments, the AbilityOne Commission ultimately

decides whether to add the service to the Procurement List.  When it adds a service to the

Procurement List, federal entities must procure that service from an AbilityOne qualified

nonprofit agency.  *See* 41 U.S.C. § 8504.

    In sum, the RSA adopts certain preferences favoring blind providers and the JWOD

favors providers who employ blind and severely disabled employees.  But the two acts and their

implementing regulations do not define clearly the boundary that separates the reach of one act

from the reach of the other, and disputes thus arise about which act should apply to certain dining

facility services on federal properties.  This action presents such a dispute.

## B.    Facts and Procedural Background[2]

### 1.  The Dispute Over Services

    This lawsuit arises out of a contract dispute at Fort Riley, Kansas.  Fort Riley is a military

base and its cafeterias are vending facilities within the reach of the RSA.  *See* 20 U.S.C. §

107(e)(7); *Kentucky v. United States*, 759 F.3d 588, 592 (6th Cir. 2014).  The Kansas

Department for Children and Families ("Kansas"), plaintiff here, is the designated State

Licensing Agency in Kansas under the RSA.  The Army solicited competitive bids under the

RSA for its last two cafeteria services contracts at Fort Riley.  And since September 2006,

Kansas has provided the Army with Full Food Service ("FFS") and Dining Facility Attendant

---

[2] The facts are taken, in part, from the jointly submitted "Stipulation of Facts" provided to the Court on February 20, 2016 (Doc. 23).

("DFA")[3] services at Fort Riley under two contracts, contract W911RX-06-D-0003 and the current contract W911RX-11-D-0006 ("the Current Contract").  This history thus suggests that Kansas' bids for vending-facilities services were sufficiently competitive, and Kansas received the contracts under the priority bidding of the RSA.  Elliott Smith is Kansas' licensed blind vendor, assigned to work with Food Services, Incorporated of Gainesville ("FSIG"), the commercial vendor who teamed with Mr. Smith to perform the Current Contract.

The Current Contract for dining facility services at Fort Riley was set to expire on August 31, 2015, but the parties agreed to extend it until February 29, 2016.  The Army asserts that the next contract at Fort Riley will be for DFA services only because soldiers who were deployed overseas now have returned to Fort Riley.  According to the Army, these soldiers will perform some of the duties that were needed under the previous contracts with both FFS and DFA services components.  Because military personnel can provide food service at Fort Riley, the Army no longer needs a contractor to provide FFS for its facilities.  But the Army still needs a contractor to perform DFA services.  Instead of soliciting bids for a new DFA services contract under the RSA, as they had for the previous two contracts, the contracting authorities at Fort Riley approached Source America to see if the AbilityOne Commission was interested in a DFA services contract.

At the preliminary injunction hearing, Larry Graham, the Contracting Officer at Fort Riley, testified that the new contract was analyzed using the Army's Mission and Installation Contracting Command Desk Book.  This led the Contract Specialist and Contracting Officer to

---

[3] FFS and DFA are the two types of military dining facility contracts referred to in Army Regulations. The RSA itself does not use the terms FFS or DFA.  The parties generally agree that FFS contracts are more expansive and typically involve food preparation.  In contrast, DFA contracts generally exclude food preparation.  DFA contracts commonly involve, however, closely related enterprises such as cleaning and sanitation of the dining facility and washing dishes, pots, and pans.

conclude that a contract for DFA services only was not subject to the RSA.  Because they did not believe the RSA applied, the Contract Specialist and Contracting Officer then consulted the Federal Acquisition Regulations, which lists the AbilityOne Program as a top priority.  The Contracting Officer then brought the need for services to the attention of the AbilityOne Commission and SourceAmerica.

### 2.  The AbilityOne Commission and the DOE's Implementation of JWOD and the RSA

According to the Army's witness from the AbilityOne Commission, Barry Lineback, the Commission tries to co-exist peacefully with the DOE's implementation of the RSA.  So, when the Commission or SourceAmerica identifies a food-related service, the Commission sends a letter notifying the DOE that they are considering adding the service to the Procurement List.  On March 16, 2015, the AbilityOne Commission notified the DOE Rehabilitation Services Administration that it might add the DFA services at Fort Riley to the Procurement List.  *See* Defendant's Exhibit 2 (admitted at the February 23 hearing).  The Commission had learned that Fort Riley had procured the past services at Fort Riley under the RSA.  *Id.* at 1.  And it thus notified the DOE so that the DOE could "take the steps it deems appropriate to communicate and coordinate with" Kansas "to determine whether the [RSA] preference applies."  *Id.* at 2.  It appears the Commission expected the DOE and Kansas to communicate and determine if the RSA applies by obtaining information about the services from Fort Riley.  It also appears that the Commission then expected Kansas to advise Fort Riley "whether it intends to exercise the [RSA] priority."  *Id.*

Mr. Lineback testified that the Commission did not receive a substantive response from the DOE.  And the Commission ultimately determined that the services were suitable for addition to the Procurement List, as it began the Federal Register notice and comment procedure.

*See* Doc. 23 at 2.  Kansas' witness from FSIG, Don James, testified that the Commission also

sent a letter to FSIG—the incumbent provider—about adding the services to the Procurement

List.  He also testified that FSIG objected to the addition.  But he did not know if any formal

comments were made by FSIG in response to the Federal Register publication.  Mr. Lineback

testified that FSIG redirected the Commission to Kansas, explaining that it was the entity to

contact about concerns stemming from the proposed addition to the Procurement List.  But, the

Commission never wrote to Kansas.  Mr. Lineback explained that the regulations require the

Commission to contact the current commercial contractor, not government agencies.

### 3.   The Complaint to the Secretary of the DOE Requesting Arbitration, the Filing of the Lawsuit Before this Court, and the Addition of the Services to the JWOD Procurement List

Neither the parties nor the Commission's letter to the DOE explained the appropriate

steps one should take to stop the process for adding services to the Procurement List.  The

Commission's letter to the DOE indicated that, if the DOE and Kansas determined that the RSA

applies, they should advise Fort Riley that they intend to exercise RSA priority.  But, the letter

never explained how to stop the Commission's process for adding services to the Procurement

List once that determination was made (whether it be through the public comment process or

otherwise).  Kansas asserts that it requested the Army comply with the RSA on March 19, 2015.

Doc. 17-1 at 5.  And, when the Army refused, Kansas filed a complaint with the Secretary of the

DOE on May 7, 2015.  This letter asked the Secretary to commence an arbitration proceeding to

determine whether the Army had violated the RSA by not procuring the services under the RSA.

*Id.* at 2; *see also* Doc. 12-3.

On July 17, 2015, the proposed addition of DFA services at Fort Riley to the

Procurement List was published in the Federal Register for public comment.  Docs. 20-5, 23 at 2.

According to Mr. Lineback, no public comments were received on the notice.  Less than a week

later, on July 22, 2015, Kansas filed its Complaint (Doc. 1) seeking an injunction pending

arbitration.  The parties stipulate that the Army learned Kansas had requested arbitration on

October 21, 2015.  Doc. 23 at 2.  But, the Complaint filed in July in this case also notified the

Army that arbitration was forthcoming.  Specifically, it states, "Kansas has initiated [the]

required arbitration process" under the RSA and seeks an injunction pending the arbitration's

outcome.  Doc. 1 at 3.[4]  As explained below, the parties dispute whether the RSA applies to the

contract, but Kansas' actions show that it intended to assert RSA priority for the contract.  But, it

also appears that this intent never was communicated to the AbilityOne Commission because, on

January 22, 2016, the Commission approved the addition of DFA services at Fort Riley to the

JWOD Procurement List with an effective date of February 21, 2016.  Docs. 20-6, 23 at 2.

### 4.  Kansas' Preliminary Injunction Motion and the Court's Preliminary Injunction Order

When Kansas learned that the Army planned to move forward with procurement under

the AbilityOne Program at the end of the Current Contract's six-month extension, it filed the

current Motion for Preliminary Injunction.  In its Response to the preliminary injunction motion

and at the hearing on it, the Army argued that without a FFS component to the contract, it no

longer falls under the RSA.  Thus, the Army contends that it does not have to give Kansas an

opportunity to bid on the new contract.  Also, because the services were added to the

Procurement List, the Army argued that the JWOD required it to purchase them from an

organization designated by the AbilityOne Commission.  The parties agreed that Kansas is not an

organization designated by the AbilityOne Commission.  Doc. 23 at 2.  The Army already had

---

[4] The Army was served with this Complaint on July 27, 2015.  Doc. 6.

identified an AbilityOne vendor to begin the new contract on March 1, 2016, and, absent an injunction, the Army planned to transition to the new vendor.

Kansas objected to the Army's conclusion that the RSA does not apply to the new contract and asked the Court to enjoin the Army from procuring the services under the JWOD pending the arbitration under the RSA. Kansas asserted that the RSA governs the new contract and, by adding the services to the Procurement List, the Army had violated the RSA by eliminating a Kansas licensed blind vendor's right to compete for the services under the RSA's priority bidding procedure. Kansas contended the arbitration panel ultimately should decide whether the Army has violated the RSA. And Kansas asserted that it has met the requirements for a preliminary injunction pending the panel's decision. The Army argued that the four preliminary injunction factors were not met. The Army also argued that the Court must decide, as a matter of law, whether the RSA or the JWOD applies to this dispute because, if the contract is not governed by the RSA, the arbitration procedure does not apply.

The Court issued its Preliminary Injunction Order (Doc. 26) on February 26, 2016. As explained in that Order, the Court considered the Army's contention that the RSA does not apply to this dispute and thus that the RSA's arbitration provision does not apply. The Court determined, however, that the dispute must be arbitrated under the RSA because:

> The federal department that Congress designated in the RSA to resolve disputes has determined that an RSA arbitration panel should resolve this dispute; and decide whether the DFA services contract at Fort Riley is governed by the RSA and thus subject to the preference granted under the RSA. Given Congress' explicit delegation of authority in the text of the RSA, the Court defers to the DOE's authority to make this decision.

Doc. 26 at 4; *see also* Plaintiff's Exhibit 10 at 1 (admitted at the February 23 hearing) (where the Department of Education rejected the Army's objections to arbitration and confirmed it will move forward to convene the arbitration panel, stating, "without further action" the report cited

by the Army "does not have the force and effect of law to override the statutory mandates in the [RSA] or rulemaking provisions in the programs regulations . . . [t]hus . . . this issue appropriately will be decided by the arbitration panel").

The Court then considered the four preliminary injunction factors and preliminarily enjoined the Army from:

> conducting any procurement, including making any award of contract in connection with cafeteria services at Fort Riley, except as permitted under the RSA and its regulations, until such time as the arbitration proceeding initiated by Kansas under the RSA is concluded, or further order modifying this preliminary injunction.

Doc. 26 at 7.  This Order addresses those four factors again, expanding on the Court's rationale for the preliminary injunction.

Kansas had asked the Court to "prohibit[] the Army from conducting any procurement including making an award of contract in connection with cafeteria services at Fort Riley until such time as the arbitration proceeding required by the [RSA] is concluded."  Doc. 1 at 8; Doc. 17 at 2.  Kansas also had asked the Court to enjoin, in part, "any attempts by the Army to place the cafeteria services at Fort Riley on the Procurement List, until the arbitration proceeding is concluded."  Doc. 17-1 at 3.  But, the AbilityOne Commission already has added the services to the Procurement List, and, because the Current Contract expired February 29, 2016, the Army required a new contract beginning March 1.  The Army asserted that it would not need a Procurement List Purchase Exception if the Court entered an injunction prohibiting procurement under the AbilityOne Program.[5]  *See* Doc. 25 at 2.  The Court determined that an injunction

---

[5] Here, the parties each argue a competing law applies—the Procurement List mandate under the JWOD and the priority bidding mandate under the RSA.  The Army's Notice that action was taken after the preliminary injunction hearing discusses a "Procurement List Purchase Exception" that can be acquired from the US AbilityOne Commission so that a service on the Procurement List does not have to be procured from an AbilityOne qualified nonprofit agency, despite 41 U.S.C. § 8504's mandate.  *See* Doc. 25.  It thus appears that the Court's injunction

11

prohibiting the Army from conducting any procurement pending the arbitration decision, except as permitted under the RSA and its regulations—*i.e.*, through direct negotiation with Kansas or inviting Kansas to bid on the contract—was appropriate.

### 5. The Army's Motion to Dismiss and Motion to Strike Plaintiff's Surreply and Kansas' Motion for Leave to Amend Complaint

After Kansas filed its Complaint, the Army filed a Motion to Dismiss (Doc. 7) under Fed. R. Civ. P. 12(b)(6). Kansas filed a response opposing the Army's motion (Doc. 12) and the Army filed a Reply (Doc. 13). Thus, the Motion to Dismiss was ripe for ruling on October 28, 2015. But Kansas filed a Surreply (Doc. 14) on November 3, 2015. The Army has moved to strike this Surreply because the Court's Rules do not permit surreplies. *See* Doc. 15.

In its Motion to Dismiss, the Army argues that the Court should dismiss the action as a matter of law because the new DFA services contract is not subject to the RSA but, instead, is governed by the JWOD. Doc. 8 at 1–3. Kansas argues in its Response that dismissal is inappropriate because Kansas has requested arbitration of the dispute under the RSA and, until that arbitration has concluded, dismissal is inappropriate. Doc. 12 at 1–2. Kansas asserts dismissal under Rule 12(b)(6) "would require [the] Court to issue a dispositive ruling on the merits of the very matter in the arbitration [proceeding] before the arbitration hearing has even been conducted." *Id.* at 2. Kansas also asserts that dismissal is inappropriate because the DFA services contract is subject to the RSA.

Essentially, Kansas argues that the issue to be decided is not ripe for review and dismissal is inappropriate because the arbitration panel will determine if the contract is subject to the RSA's priority bidding procedure. Doc. 12 at 7–8. The Army's Reply, however, contends that

---

suffices hold the parties in place pending the arbitration panel's decision whether the RSA applies to the DFA services contract.

the Court can decide the dispute as a matter of law because Kansas chose to seek *permanent* injunctive relief in addition to preliminary injunctive relief in its Complaint.  Doc. 13 at 2, 6–7.  On January 25, 2016, Kansas moved to amend its Complaint to remove all references to permanent injunctive relief (Doc. 16).  The Army argues the Court should not allow Kansas to amend its Complaint because Kansas' motion was untimely, the amendment unfairly would prejudice the Army, and the amendment would be futile.  *See* Doc. 19.

Because the facts and parties' arguments underlying the dismissal motion are, in essence, the same as those for the preliminary injunction motion, the Court will address most of the parties' arguments in its preliminary injunction analysis, below.[6]  The Court then will address the effect of its arbitrability decision and preliminary injunction in the context of the Motion to Dismiss and the Motion to Amend Complaint, as well as address the Army's Motion to Strike.

## II.    Preliminary Injunction Analysis

This analysis supplements the Court's Order granting Kansas' request for a preliminary injunction by examining the parties' arguments in more detail and explaining the Court's reasoning more fully.

### A.    Legal Standard

The limited purpose of a preliminary injunction under Fed. R. Civ. P. 65 is "merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  To prevail on a motion for preliminary injunction, the movant must prove that all four of the following equitable factors weigh in its favor:  (1) it will suffer irreparable injury if the injunction is denied; (2) its threatened injury outweighs the injury the opposing party will suffer under the injunction; (3) the injunction, if issued, will not be

---

[6] The Army incorporates by reference its arguments in the Motion to Dismiss into its Response to Kansas' Motion for Preliminary Injunction.  *See* Doc. 20 at 15–16.

adverse to the public interest; and (4) it is substantially likely to succeed on the merits. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (citation omitted).

A preliminary injunction "merely preserves the status quo until a final determination of a controversy can be made." *Wichita Wire, Inc. v. Lenox*, 726 P.2d 287, 290 (Kan. Ct. App. 1986). And whether to grant a preliminary injunction rests within the Court's sound discretion. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citations omitted). A preliminary injunction is an extraordinary remedy, so the right to relief must be "clear and unequivocal." *Id.* "In general, 'a preliminary injunction . . . is the exception rather than the rule.'" *Gen. Motors Corp.*, 500 F.3d at 1226 (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

**B.      The Four Preliminary Injunction Factors**

The next four subsections apply the four prongs of the governing standard to the facts and arguments presented. As the Court explained in its previous Preliminary Injunction Order, Kansas has carried its burden.

**1.   Irreparable Harm**

The Court first examines whether the Kansas has shown irreparable harm. "[C]ourts have consistently noted that '[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Dominion Video Satellite v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260–61 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)); *see also Amedisys, Inc. v. Interim Healthcare of Wichita, Inc.*, No. 14-1357, 2015 WL 1912308, at*2 (D. Kan. Apr. 27, 2015) ("Irreparable harm is the most important factor in obtaining a preliminary injunction.").

14

Irreparable harm "'does not readily lend itself to definition.'" *Dominion Video*, 356 F.3d at 1262 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). And proving irreparable harm is not "'an easy burden to fulfill.'" *Id.* (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). "To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The Court must determine if the harm is likely to occur before a ruling on the merits can issue. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

A plaintiff establishes irreparable harm by demonstrating "'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1258). Normally, an award of monetary damages can remedy a monetary loss, and thus the risk of economic harm typically is not irreparable. But, there are exceptions and courts have issued injunctions in situations where, arguably, a damage award could have alleviated the anticipated harm. *See, e.g.*, *Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1552 (D. Kan. Oct. 4, 1993) (finding monetary loss would cause irreparable harm because the defendant was a state agency and "the Eleventh Amendment would bar the plaintiff hospitals from suing the state for damages if it turns out that the proposed copay requirement is excessive").

Kansas contends that both Kansas and the manager it selected under the RSA will suffer irreparable harm unless the Court issues an injunction. Specifically, Kansas argues that, without an injunction, the blind manager will lose his job and Kansas will lose "a considerable set aside fee which it collects from managers of facilities." *Id.* Kansas asserts that this set aside fee helps fund the services provided for all blind managers in the RSA program. Importantly, Kansas

argues that sovereign immunity prevents it from remediating these losses even if the arbitration panel finds in its favor.

The Army argues that **Kansas** has not suffered irreparable harm because "[e]conomic injury is not irreparable harm." Doc. 20 at 19. It asserts that the blind vendor's harm is irrelevant because the contract would have been awarded to Kansas, not the blind vendor. And it contends that a lost set aside fee, a lost opportunity to compete for a contract, and lost profits are all economic losses, which are not irreparable. While the Army acknowledges that "contracts for the operation of military dining facilities are very lucrative for [Kansas]," it argues that Kansas still can bid on other cafeteria contracts at different federal properties. Doc. 20 at 21. Thus, the Army contends that placing the DFA requirement on the AbilityOne Procurement List is not detrimental to Kansas. And it contends that Elliot Smith, the RSA licensed blind vendor at Fort Riley, can apply for employment with the AbilityOne vendor selected by the Army.

The Court finds that **Kansas** has established irreparable harm. Without an injunction to protect it in the interim, Kansas has established that it could not compete for the new contract at Fort Riley before an arbitration ruling on the merits of the underlying dispute. This presents a significant risk of harm to Kansas money cannot compensate. The Court agrees with Kansas' assertion that sovereign immunity bars an arbitration panel or federal court from granting Kansas damages in the event that the Army has violated the RSA. *See Johnson v. United States*, No. EP-14-CV-00317-DCG, slip op. at 13 (W.D. Tex. Sept. 12, 2014) (citing *Kentucky v. United States*, 759 F.3d 588, 599 (6th Cir. 2014)); *see also Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied." (citations omitted)).

If the arbitration panel concludes the new contract falls within the RSA—as Kansas alleges—the Army is required to invite Kansas to bid on the contract and must give Kansas priority when awarding the contract if its bid is within a competitive range.  *See* 20 U.S.C. § 107a(a)(5); 34 C.F.R. § 395.33(a)–(b).  Kansas' previous bids were competitive and the Army awarded the contracts to Kansas.  Terry Smith, an RSA consultant, testified that Kansas could lose about $350,000 per year from set aside fees from the blind vendor, monthly fees from the blind vendor's teaming partner, and matched federal dollars.  The Army argues that some of this money covers costs that Kansas will not incur without the contract, the matched federal dollars are not guaranteed, and the blind vendor can seek other employment.  But, even if harm to Kansas' blind vendor is irrelevant, Kansas' harm is tied directly to the blind vendor's employment.  Mr. Terry Smith testified that there currently are no other blind vendor jobs available through Kansas.  Thus, the evidence at the preliminary injunction hearing credibly established that, without an injunction, Kansas would suffer a substantial economic loss for which no remedy exists even if it prevails in arbitration.  *See Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (finding if "adequate compensatory or other corrective relief" will not be available later in the litigation this factor weighs toward a finding of irreparable harm); *cf. Kan. Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1552 (D. Kan. 1993) (finding monetary loss would cause irreparable harm because the defendant was a state agency and "the Eleventh Amendment would bar the plaintiff hospitals from suing the state for damages if it turns out that the proposed copay requirement is excessive").

Kansas has established a significant risk of irreparable harm and has demonstrated that the harm is not speculative.  *See RoDa Drilling Co.*, 552 F.3d at 1210.  Because of sovereign immunity, monetary damages will not compensate Kansas for the harm it faces.  Therefore, the

Court finds that Kansas has established that it will sustain irreparable harm without preliminary injunctive relief.  This factor favors issuing a preliminary injunction.

## 2.   Balance of Harms

Under this second factor, the Court must "balance the competing claims of injury and consider the effect of granting or withholding the requested relief" on both parties.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008).

Kansas argues that, without an injunction, its threatened injury outweighs whatever damage the requested injunction might inflict on the Army.  Kansas asserts that an injunction will maintain the status quo.  The Army entered into the last two contracts for Fort Riley with Kansas after soliciting bids in compliance with the RSA and, Kansas contends, following the RSA procedures for this new contract will not cause any significant hardship to the Army. Kansas argues its blind vendor can continue to provide the DFA services that Fort Riley seeks pending the arbitration's outcome, just as it has done under the six-month extension of the Current Contract, resulting in no interruption of services to the Army.

The Army argues that it "has no alternative but to obtain the DFA services from an AbilityOne vendor" because the DFA services at Fort Riley were added to the Procurement List on January 22, 2016, with an effective date of February 21, 2016.  Doc. 20 at 34.  And, the Army says, the JWOD requires the Army to hire a qualified AbilityOne organization for services on the Procurement List.  *See* 41 U.S.C. § 8504; Doc. 23 at 2 (stipulating that "by operation of law" the DFA services at Fort Riley must be acquired from an AbilityOne designated organization).  The Army also asserts that it already has identified a new AbilityOne vendor and an injunction "[p]reventing the completion of the acquisition of DFA services through the AbilityOne vendor

would harm the Army and the vendor by disrupting completion of the procurement process." Doc. 20 at 34.

After weighing the parties' arguments and the evidence, the Court finds that the Army's arguments are less persuasive than Kansas'. Without the preliminary injunction issued on February 26, the Current Contract would have expired on March 1 and thus a new vendor would have begun providing the DFA services. The Army argues that the law requires it to procure services from an AbilityOne organization. But Kansas argues that the law requires the Army to allow Kansas to submit a bid under the priority bidding procedure outlined in the RSA. Which federal act or acts should apply to the new contract is, according to the RSA, an issue for the DOE arbitration panel to determine. Kansas requested that the Army comply with the RSA as early as March 19, 2015, and initiated the arbitration procedure long before the DFA services at Fort Riley were added to the Procurement List. Indeed, the arbitration proceeding that Kansas asked to convene already could have made substantial progress toward its outcome, but for the Army's decision to ask the DOE not to convene it. With a preliminary injunction, the Army can continue procuring its needed services under the RSA's provisions instead of from the AbilityOne vendor. Conversely, without an injunction, the Army would procure the services from the AbilityOne vendor, leaving Kansas unable to recover monetary damages if Kansas prevails in arbitration.

The Court finds that an injunction is appropriate relief to maintain the status quo, and allows the Army to obtain the DFA services it seeks under the procedures contemplated by the RSA pending the outcome of arbitration. This factor thus favors Kansas.

### 3. Public Interest

Kansas argues that public policy favors economic stability and opportunities for the blind and, because the RSA promotes these interests, public policy favors a preliminary injunction.

The Army argues that an injunction actually disfavors the public interest because AbilityOne vendors employ more blind and disabled persons than typically benefit under a contract procured under the RSA.  The Army also contends the public interest favors allowing the Army to complete its procurement processes without excessive judicial interference.

Congress has decided that public policy favors employment opportunities both for blind and severely disabled persons.  It enacted both the RSA and the JWOD to promote those opportunities.  Congress also mandated an arbitration procedure for disputes over the RSA's applicability to the Army's procurement process.  An injunction from this Court pending resolution in arbitration is consistent with Congress' intent and promotes the dispute's resolution with minimal judicial interference.  This factor thus is neutral.

### 4. Substantial Likelihood of Success on the Merits

Our Circuit applies a more lenient standard to evaluate a party's likelihood of success on the merits if the preliminary injunction movant has established the other three factors.  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001) (citation omitted).  In this situation, the movant need not show "a substantial likelihood of success" and instead "need only prove that there are questions going to the merits . . . so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  *Id.* at 1246–47 (citation and internal quotation marks omitted).

Here, the parties' arguments about Kansas' substantial likelihood of success orbit around the question whether the RSA applies to the new contract for DFA services at Fort Riley.  The Court has decided that Congress reserved the merits of this question for an arbitration panel convened by the DOE's Secretary under 20 U.S.C. §§ 107d-1(b), 107d-2 of the RSA.  But, at the preliminary injunction stage, the Court must consider the parties' arguments to determine

whether Kansas is likely enough to succeed on the merits of this issue in arbitration.  The Court finds it is.

Kansas contends it is likely to prevail in arbitration because the RSA and its regulations apply to DFA contracts like one for Fort Riley and the Army already has lost two arbitration proceedings that considered similar contracts for DFA services.  The Army, in contrast, contends Kansas cannot make the requisite showing because Congress never intended for the RSA to govern such contracts, as manifested in various legislative reports and other actions considering the boundary between the JWOD and the RSA.  The Court addresses each one of these arguments, below.

### i.   Respect for the Contracting Officer's Decision

The Army argues that the Court must respect the procurement decision by Fort Riley's Contracting Officer that the RSA does not apply to the new contract.  The Army says the Court should uphold the Contracting Officer's decision that the RSA (and therefore arbitration under that act) do not apply and thus should refrain from entering an injunction, unless the Court concludes that his judgment was arbitrary, capricious, or an abuse of discretion.  *See* Doc. 20 at 22–23.  But this argument confuses what the Court must determine right now.  Kansas' preliminary injunction motion merely asks the Court to preserve things as they are until the DOE's arbitration proceeding decides whether the RSA applies (as Kansas contends) or does not (as the Army insists).  The Court determines now whether Kansas is likely to succeed at that proceeding, not whether the Officer's decision was arbitrary, capricious, or an abuse of discretion.

This distinction is important.  And it is one that leads the Court to emphasize the preliminary nature of this injunction ruling.  The Court does not decide that the RSA applies to the Fort Riley contract, or that it does not.  Congress conferred the power to decide that question

on a panel of arbitrators convened in the fashion specified by the RSA.  Indeed, the only reason that the Court evaluates the relative merits of that ultimate question is because the fourth prong of the preliminary injunction standard requires it to do so.  *See Gen. Motors Corp.*, 500 F.3d at 1226.  Given Kansas' other showings, this standard simply asks whether merits questions exist that are "so serious, substantial, difficult, and doubtful" that the merits of the parties' dispute deserve "more deliberate investigation."  *Prairie Band*, 253 F.3d at 1246–47.  As the next sections explain, such questions exist and this conclusion makes a status quo-preserving injunction appropriate.

### ii.  Previous Arbitrations

Kansas argues that two previous arbitrations, one at Fort Campbell, Kentucky, and one at Fort Stewart, Georgia, have considered whether similar solicitations for DFA services must comply with the RSA.  *See* Docs. 17-4, 17-5.  Both arbitration panels decided against the Army.  The Army argues the arbitration panel decisions are incorrect and have no persuasive or binding authority on this Court.  And, for reasons discussed in more detail below, the Army asserts that the Fort Campbell arbitration no longer applies because of recent federal district court decisions in that case.  But, the Fort Stewart panel considered many arguments identical to those presented by the Army here, including the Army's arguments about the most recent developments under the two acts.  That panel ultimately determined that the Fort Stewart DFA services contract was subject to the RSA.  *See* Doc. 17-4 at 8–35.

While the Court is not bound by these panel decisions, they are entitled to respectful consideration, particularly because a similar arbitration panel likely will decide this similar dispute at Fort Riley.  Kansas' counsel informed the Court at the February 23 hearing that he expects that two of the three arbitrators who will decide this dispute are the same arbitrators who

were on the panels at Fort Stewart and Fort Campbell.  The Court finds the prior arbitration decisions help Kansas demonstrate that it is likely to succeed on the merits in arbitration.

### iii.  The RSA and its Regulations

Kansas asserts that the language of the RSA and its regulations directly applies to the contract for DFA services.  Congress tasked Secretary of the DOE with promulgating regulations under the RSA which "establish a priority for the operation of cafeterias on Federal property by blind licensees."  20 U.S.C. § 107d-3(e).  The DOE's current regulations state that "such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible" and require a federal agency to invite the State Licensing Agency to bid "whenever a cafeteria contract is contemplated."  34 C.F.R. § 395.33(a)-(b).  The regulations also provide that "[a]ll contracts or other existing arrangements pertaining to the operation of cafeterias on Federal property not covered by contract with, or by permits issued to, State licensing agencies shall be renegotiated subsequent to the effective date of this part on or before the expiration of such contracts or other arrangements pursuant to the provisions of this section."  34 C.F.R. § 395.33(c).

Kansas argues that the Fort Riley DFA services contract is a contract for the operation of the cafeteria, or at a minimum is a contract "pertaining to the operation" of the cafeteria, and so, under the RSA and its regulations, Fort Riley must allow Kansas to submit a bid.  The Army argues that the contract is not for the operation of the cafeteria because it no longer involves any food service and, instead, is purely janitorial in nature.  It contends military personnel now will operate the cafeteria, not the blind vendor (*i.e.* it is no longer a FFS contract and, thus, the Army argues, no longer a contract under the RSA).  Kansas argues, in contrast, that even if food service is required for the RSA to apply, the contractor under the new contract must wash dishes, bus tables, and perform other services indispensable to food service.  Thus, Kansas contends that the

23

RSA still applies to the new contract because it "pertains to" the cafeteria's food service operations. And Kansas asserts that there can be more than one cafeteria "operator" because the RSA does not distinguish between FFS or DFA services and does not require that vendors operate the entire facility. Kansas argues Fort Riley needs the contractor's cleaning services for the dining facility to operate, thus the DFA contract is one for the "operation" of part of the cafeteria.

The Army argues that Kansas stretches the "operation" and "pertaining to" language in the RSA's regulations too broadly. It also asserts that that the "pertaining to" section of the regulation was just a transitional provision and it no longer applies. Doc. 13 at 8–11. It cites two Court of Federal Claims decisions which, it contends, show the RSA does not apply to contracts like this one for DFA services only. *See* Doc. 20 at 16 (citing *Washington State Dep't of Servs. for the Blind v. United States*, 58 Fed. Cl. 781 (2003) and *Mississippi Dep't of Rehab. Servs. v. United States*, 61 Fed. Cl. 20 (2004)). But Kansas correctly notes that the two cases never conclude what "operation" means and they never held that the RSA does not apply to DFA services contracts. The Army cited these same cases in the two arbitration proceedings at Fort Campbell and Fort Stewart. *See* Doc. 17-4 at 22–26; Doc. 17-5 at 21–22, 26. The Army's reliance on these cases did not persuade either arbitration panel. Instead, they concluded that the determination whether the RSA applies to a contract is determined on a case-by-case basis. The arbitration panels also have rejected the Army's argument that the "pertaining to" language in the regulation no longer applies. *See* Doc. 17-4 at 13–21; Doc. 17-5 at 17–18. At Fort Stewart, the panel analyzed 34 C.F.R. § 395.33(c) and explicitly rejected the Army's contention that the regulation merely was transitional, finding the DOE could not have intended that result. *See*

Doc. 17-4 at 13–21.  In sum, the Court finds that the earlier arbitration panels make Kansas

likely to prevail on the merits of the dispute presented here at arbitration.

### iv.  Legislative Reports and Developments

The Army next argues that its interpretation of the RSA and the JWOD is in line with

direction given by Congress.  Kansas disagrees and argues that no developments cited by the

Army change the law or diminish Kansas' likelihood of success in arbitration.

### a.    The National Defense Authorization Act for Fiscal Year 2006, the 2006 Joint Report to Congress, and the Analysis of the 2006 Joint Report

In response to confusion about when the RSA should apply and when the JWOD should

apply, Congress passed § 848 of the National Defense Authorization Act for Fiscal Year 2006

(the "2006 NDAA").  This provision directed the DOE, DoD, and CFP to issue a joint statement

of policy about the acts' applications.  The DOE, DoD, and CFP then issued a joint report titled

"Application of the Javits-Wagner-O'Day Act and the Randolph-Sheppard Act to the Operation

and Management of Military Dining Facility Contracts" (the "2006 Joint Report").  The 2006

Joint Report made a number of recommendations to Congress, including:  (1) that Congress

should enact a "no poaching" provision which would require existing contracts to remain

governed by the procurement statue already in place for those contracts; (2) that the RSA should

apply to contracts when the contractor will exercise management responsibility and day-to-day

decision-making for the overall functioning of the facility; and (3) that the JWOD should apply

when the DoD needs dining support services but DoD personnel are exercising overall functional

and management responsibilities.  *See* Doc. 20-7.  The Senate's Health, Education, Labor and

Pensions Committee asked the DoD, DOE, and CFP to issue a joint analysis of the 2006 Joint

Report (the "Joint Report Analysis") to explain the reasoning behind the recommendations in the

2006 Joint Report.  This Joint Report Analysis explains that the 2006 Joint Report recommends that RSA contractor priority apply only where the RSA contractor will operate an *entire* dining facility.  *See* Doc. 20-8 at 8.

The Army argues that the 2006 Joint Report and Joint Report Analysis show that the JWOD should apply to the new contract at Fort Riley because it is only for support services, not for the operation of the entire facility.  The Army also asserts that this has been the DOE's policy since its representative signed the Joint Report in 2006 because the DOE has taken no action to retract the Report.  But the DOE also has not incorporated the Joint Report into the RSA's regulations and it appears that current DOE policy is to arbitrate disputes whether the RSA should apply to a DFA services contract.[7]

Kansas argues that the 2006 Joint Report and Joint Report Analysis merely are policy recommendations with no legal authority.  Kansas points out that Congress enacted the "no poaching" provision in § 856 of the John Warner National Defense Authorization Act for Fiscal Year 2007, but has not enacted any other recommendations from the 2006 Joint Report.  Kansas thus argues that the 2006 Joint Report's recommendations about when the JWOD or the RSA should apply have no legal effect because:  (a) they have not been enacted into law; and (b) the Report did not go through the notice, comment, and review procedures required for regulations.  Kansas also provides a DoD memorandum which asserts the joint policy in the 2006 Joint Report "should not be cited in individual solicitations until it is implemented in complementary regulations by the [DOE] and DoD."  Doc. 17-6 at 2.

---

[7] This inference is manifested by the arbitration panel convened for this dispute under the RSA and the arbitration panels referenced by the parties in their arguments.  Indeed, the DOE explicitly rejected the Army's argument that the 2006 Joint Report policy governs when it overruled the Army's objections to convening an arbitration panel to decide the Fort Riley dispute.  *See* Plaintiff's Exhibit 10 at 1 (admitted at the February 23 hearing).  The Fort Stewart arbitration panel "defer[red] to the DOE policy that each case in this arena must be determined on a case by case basis."  Doc. 17-4 at 25.

The Court finds Kansas has the better of these arguments.  Its arguments persuade the Court to conclude that, without regulations implementing the recommendations in the 2006 Joint Report, Kansas is likely to succeed in arbitration.  *See Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 186 (Fed. Cl. 2007), aff'd, 314 F. App'x 277 (Fed. Cir. 2008) ("Because no regulations have been implemented to give effect to the policies set forth in the [2006] Joint Report, and because the DoD has clarified that the Joint Report would not be effective until implemented through regulations, the Joint Report was not binding on the Army in awarding the contract.").

> **b.** **National Defense Authorization Act for Fiscal Year 2015 and the Joint Explanatory Statement to Accompany the 2015 NDAA**

The National Defense Authorization Act for Fiscal Year 2015 (the "2015 NDAA") authorizes appropriations for Army procurement and thus funds the new DFA services contract at Fort Riley.  The Joint Explanatory Statement accompanying the 2015 NDAA (the "Joint Explanatory Statement") expresses concern that there still is a need for regulatory guidance about how to apply the JWOD and the RSA to military dining facilities despite the 2006 Joint Report, Joint Report Analysis, and subsequent enactment of the "no poaching" provision.  The Joint Explanatory Statement also asserts that, without complementary regulations to implement the 2006 Joint Report, confusion will persist, especially for new contracts.  The Joint Explanatory Statement observes:

> Pursuant to the [2006 Joint Report], the Randolph-Sheppard Act applies to contracts for the operation of a military dining facility, or full food services, and the Javits-Wagner-O'Day Act applies to contracts and subcontracts for dining support services or dining facility attendant services for the operation of a military dining facility.

Doc. 20-11 at 4. It then directs the Secretary of Defense to implement the 2006 Joint Report by promulgating regulations explaining how the two acts should apply to new contracts within 180 days after the 2015 NDAA's enactment. *Id.* As discussed in the next section, the DoD currently is working on implementing regulations to clarify this confusion.

The Army asserts that those pending rules will "dispel all confusion as to whether the RSA priority applies to DFA services contracts." Doc. 20 at 24. While the Army admits the Joint Explanatory Statement is not statutory law, it contends that the statement shows Congressional intent for the scope of the two acts. The Army argues that the 2015 NDAA and Joint Explanatory Statement prove the RSA does not apply to the DFA services contract at Fort Riley and, therefore, Kansas is not likely to succeed on the merits in arbitration. The Army also points to a recent case considering the 2015 NDAA and the Joint Explanatory Statement— *Kentucky ex rel. Educ. & Workforce Dev. Cabinet KY Office for the Blind v. United States*. No. 5:12-CV-00132-TBR, 2015 WL 1541987 (W.D. KY Apr. 7, 2015).

The *Kentucky* case involved a contract dispute over DFA services at Fort Campbell's dining facilities. *Kentucky*, 2015 WL 1541987, at *1. Like the dispute here, the Army previously had contracted for FFS at Fort Campbell, but then decided to solicit only DFA services for its next contract. *Id.* The Army argued that the JWOD should apply to the new contract and Kentucky's state licensing agency argued that it was entitled to priority under the RSA. *Id.* The dispute was arbitrated under the RSA and the panel decided that the RSA applied. *Id.* Initially, the court enjoined the Army from procuring the contract under the JWOD and ordered the Army to negotiate a new contract for DFA services in compliance with the RSA. *Id.* at *2. But then the Army, pointing to the language in the Joint Explanatory Statement, filed a Motion to Stay the injunction and a Motion to Reconsider. *Id.*

28

The *Kentucky* court acknowledged the 2015 NDAA and the Joint Explanatory Statement as "congressional language enacted only days before" its injunction order. *Id.* And upon reviewing the Joint Explanatory Statement, the *Kentucky* court concluded that "Congress's directive fills the legislative silence that this Court and other adjudicating bodies have confronted." *Id.* at *3. It also found that "[w]ith the 2015 NDAA, Congress has explicitly stated that the [RSA] applies to contracts for the operation of a military dining facility—that is, to full food services— and that it does not apply to the DFA services that are the subject of this litigation. Therefore, Congress has expressed that it does not intend to grant bidding priority to blind vendors for the DFA services . . . ." *Id.* Because of the "new congressional activity" the *Kentucky* court decided that "enforcement of the . . . injunction [was] inappropriate" and stayed the injunction it previously had entered "during the 180-day period within which Congress directed the [DoD] to issue its regulations." *Id.* at *4. Then, plaintiff expressed concern that the regulations would not issue during the 180-day period. The *Kentucky* court responded that it would revisit the matter if the DoD failed to issue the regulations in a timely manner. *Id.* The *Kentucky* court recognized "that the [DoD] regulations will offer additional guidance" but "may not assume the form that the [Army] envisions." *Id.* So, the *Kentucky* court decided to hold in abeyance the Army's Motion for Reconsideration, finding it could not rule that motion until the DoD regulations were issued. *Id.*; *Kentucky*, No. 5:12-CV-00132-TBR, slip op. at 1 (W.D. KY June 29, 2015).

Here, Kansas argues that *Kentucky* "mistakenly views the Joint Explanatory Statement as an explicit statement by Congress." Doc. 17-1 at 22 n. 62. Kansas asserts that the Joint Explanatory Statement was not an actual conference committee report, but rather an agreement between the Chairman of the House Committee on Armed Services and the Chairman of the

Senate Committee on Armed Services. *Id.* at 19. Kansas also contends that neither chamber of Congress voted on the Joint Explanatory Statement and the Statement goes beyond the scope of the 2015 NDAA, and thus has no legal effect. *Id.* at 20.

The recent arbitration panel at Fort Stewart agreed with the premise of the argument Kansas advances here about the 2015 NDAA and Joint Explanatory Statement. *See* Doc. 17-4 at 33–36. The Fort Stewart panel found that the Joint Explanatory Statement "is limited in the same way that the 2006 Joint Report to Congress is limited," *i.e.*, it has no legal effect until the implementing regulations are issued. *Id.* at 33–34. The DOE also rejected the Army's position when it overruled its objection to arbitration, stating: "The [2006] Joint Report was a declaration of policy agreements between the parties, and without further action does not have the force and effect of law to override the statutory mandates in the [RSA] or rulemaking provisions in the programs regulations." Plaintiff's Exhibit 10 at 1 (admitted at the February 23 hearing).

The *Kentucky* court treated the Joint Explanatory Statement as Congress' interpretation of how the two acts should be applied. The Statement, however, directed the DoD to issue regulations, which to date have not issued. As explained below, while the *Kentucky* injunction remains stayed, the *Kentucky* court appears reluctant to continue the stay because of the DoD's delay in issuing implementing regulations. Accordingly, the Court is not persuaded that *Kentucky* disfavors a preliminary injunction. Its careful approach does not detract from the Court's conclusion here that Kansas is likely to prevail in arbitration on its argument alleging that the 2006 Joint Report and Joint Explanatory Statement are not the law and, under the current RSA and implementing regulations, the Army has violated the RSA. Kansas, at a minimum, has raised questions so serious, substantial, difficult, and doubtful as to make the issue ripe for arbitration and deserving of more deliberate investigation.

c.      **Forthcoming Regulations**

Just as the Army argued in the *Kentucky* case, the Army contends here that the Court should not preliminary enjoin Kansas here because "significant work has been done on drafting" the regulations contemplated by the 2006 Joint Report and Joint Explanatory Statement.  Doc. 20 at 15.  It contends the forthcoming DoD regulations will explain that the RSA does not apply to contracts for DFA services.  The Army also asserts that these developments show that Congress has "addressed the issue at the heart of [p]laintiff's claim . . . and has clarified that the [RSA] does not apply."  Doc. 8 at 23.  Kansas, in contrast, argues a preliminary injunction is appropriate because no regulations have issued yet and, thus, it is substantially likely to prevail in arbitration.

The regulations were not issued within the 180-day period directed in the Joint Explanatory Statement.  And the plaintiff in *Kentucky* has twice moved to lift the stay of the injunction because of the DoD's failure to issue the regulations.  *Kentucky*, No. 5:12-CV-00132-TBR, slip op. at 1 (W.D. KY Aug.7, 2015); *Kentucky*, No. 5:12-CV-00132-TBR, slip op. at 1 (W.D. KY Nov. 19, 2015).  The *Kentucky* court denied plaintiff's first motion and continued to stay the action an additional 60 days because, while the DoD had not issued the regulations within the 180 days, the Army produced a declaration that the drafting committee was working on the regulations, anticipated "that the proposed regulation will be published in the Federal Register by mid-September," and that the committee "was considering an interim rule." *Kentucky*, slip op. at 4 (W.D. KY Aug. 7, 2015).  The court denied plaintiff's second motion to lift the stay as well.  *Kentucky*, slip op. at 1 (W.D. KY Nov. 19, 2015).  The DoD did not publish the proposed regulations in the Federal Register by September 2015 and it admitted later, in *Kentucky*, that the regulations likely would not be ready within another 90 days.  *Id.* at 3–4.  But because the Army showed that the DoD had performed further work on the regulations since the last hearing, the *Kentucky* court reluctantly agreed to continue to stay the action.  *Id.* at 4.  But

31

the *Kentucky* court stated that it "is troubled by the [DoD]'s inability to publish the proposed regulations in a timely fashion" especially considering the timeline imposed by the Joint Explanatory Statement for promulgating the regulations.

Months have passed since the last *Kentucky* order. No regulations have been published. While the Army submits that "the draft proposed rule has been fully vetted within the DoD," it appears the publication of final regulations will not occur in the near future. Doc. 20 at 15. The Army provides a Declaration of Linda Neilson, a DoD employee with expertise on the agency's rulemaking process. *See* Doc. 20-12. Ms. Neilson declares that "[t]he current status of the draft proposed rule publication . . ., is that, on February 11, 2016, the DoD submitted the draft proposed rule to the Office of Management and Budget's Office of Information and Regulatory Affairs [(the "OMB/OIRA")] . . . ." *Id.* at 5. This is the sixth step of a 17-step approval process. *See id.* The standard approval timeline for regulations indicates that steps six and seven typically take four weeks, but Ms. Neilson testified that the DOE has expressed interest in the proposed regulations, which may make step seven more complex and time consuming. *See id.* at 5, 7. Proposed regulations are not published in the Federal Register until step eight, which, on the standard timeline, is estimated at 4.5 weeks. *See id.* at 7. The mid-September 2015 estimate for this step asserted in the *Kentucky* case has long passed. And, once the proposed regulations are published, a 60-day public comment period begins (step nine). *See id.* at 5, 7. Steps 10 through 17 are estimated on the standard timeline to take another 19 weeks. So, while the DoD indeed is drafting regulations, this lengthy process is far from over.

While the Court understands the rulemaking process takes time, it is not persuaded that Congress has addressed the issue at the heart of Kansas' claim. The DOE has expressed interest in the proposed regulations and, presumably, it will make an influential contribution to their

development because Congress charged the DOE with responsibility for implementing the RSA. Until the regulations are issued, and thus finalize guidance about the interplay between the RSA and the JWOD, the Court cannot determine that those putative regulations change the likelihood that Kansas will prevail. Even with the 2006 Joint Report, Joint Explanatory Statement, and the DoD's proposed (but incomplete) regulations, the *Kentucky* court determined that it could not grant the Army's Motion for Reconsideration until the regulations were issued. *See Kentucky*, 2015 WL 1541987, at *1. And without implementing regulations, the Fort Stewart arbitration panel decided against the Army. *See* Doc. 17-4 at 33–34.

The DOE arbitration panel convened to decide this dispute will have the last word (and the one that matters) about the facts and arguments specific to this dispute. But the Court finds that Kansas has shown a substantial likelihood of success in arbitration. Under the more lenient standard applicable to this factor, Kansas has raised questions so serious, substantial, difficult, and doubtful so as to make the issue ripe for arbitration and deserving of more deliberate investigation. The Court thus concludes that the fourth prong of the preliminary injunction test favors Kansas.

### C.      Kansas is entitled to a preliminary injunction.

Because Congress has decided that an arbitration panel convened by the Secretary of Education must arbitrate the parties' dispute, and because Kansas has established the four requirements for a preliminary injunction, the Court grants Kansas' Motion for Preliminary Injunction and stays this case pending further motions or the outcome of the arbitration proceeding. Under Fed. R. Civ. P. 65(a), the Court preliminarily enjoins the Army from:

> conducting any procurement, including making any award of contract in connection with cafeteria services at Fort Riley, except as permitted under the RSA and its regulations, until such time as the arbitration proceeding initiated by Kansas under the RSA is concluded, or further order modifying this preliminary injunction.

Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c).  But here, the Army elected not to ask the Court to require Kansas to post such security.  Given this decision, the Court exercises its discretion under the rule and requires no security.  *See RoDa Drilling Co.*, 552 F.3d at 1214 (holding that district courts have "wide discretion under Rule 65(c) in determining whether to require security").

### III.    Motion to Dismiss, Motion to Strike Surreply, and Motion to Amend Complaint

In the Court's Preliminary Injunction Order, it determined that the crux of the parties' dispute—*i.e.*, whether the solicitation of DFA services must comply with the RSA—must be arbitrated.  *See* Doc. 26 at 2–3.  In this context, the Court now addresses three pending motions: (A) the Army's Motion to Strike Plaintiff's Surreply to Defendant's Motion to Dismiss (Doc. 15); (B) the Army's Motion to Dismiss (Doc. 7); and (C) Kansas' Motion for Leave to File First Amended Complaint for Preliminary Injunction (Doc. 16).

### A.    Motion to Strike

First, the Court considers the Army's Motion to Strike Plaintiff's Surreply to its Motion to Dismiss.  *See* Doc. 15.  Under D. Kan. R. 7.1(a) and (c), parties are permitted to file a dispositive motion, a response, and a reply.  Generally, surreplies are not allowed.  *Mansoori v. Lappin*, No. 04-3241-JAR, 2007 WL 401290, at *1 (D. Kan. Feb. 1, 2007).  The Court may permit surreplies, but only with leave of court and only in rare circumstances, *e.g.*, where a movant improperly raises new arguments in a reply.  *See id.*

Here, Kansas did not seek leave to file a surreply and has identified no circumstance that would justify granting it leave to file a surreply.  The Court thus grants the Army's Motion to Strike Plaintiff's Surreply (Doc. 15) and strikes that Surreply (Doc. 14).  Although the Court will

34

not consider Kansas' Surreply in the motion to dismiss analysis below, the Court nevertheless has reviewed Kansas' improper submission and has determined that it contains nothing that would alter the outcome.  The Court would reach the same result on the Army's Motion to Dismiss with or without the arguments in Kansas' Surreply.

**B.     Motion to Dismiss**

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint need not include "'detailed factual allegations,'" but must offer more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Essentially, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  When considering a Rule 12(b)(6) motion, a district court must accept as true all factual allegations in the complaint, but need not afford such a presumption to any legal conclusions it may assert.  *Iqbal*, 556 U.S. at 678.

Kansas calls its Complaint a "Complaint for Preliminary and Permanent Injunction," and requests "preliminary and permanent injunctions prohibiting the Army's conduct of any procurement of cafeteria services until such time as the arbitration required by the [RSA] is concluded."  Doc. 1 at 6.  While permanent injunction language exists in the Complaint, the majority of the document discusses Kansas' assertion that it is entitled to a preliminary injunction.  The Army moves to dismiss Kansas' Complaint under Rule 12(b)(6).  *See* Doc. 7 at

35

1.  The Army argues the Court can dismiss the action because, as a matter of law, DFA services contracts are not subject to the RSA, but, instead, are subject to the JWOD.  The Army's dismissal motion asserts the same arguments it later employed to oppose Kansas' preliminary injunction motion.  *See* Doc. 8; *see also* Doc. 20 at 15–16 (incorporating by reference the Army's arguments in the Motion to Dismiss into its preliminary injunction Response).

Essentially, the Army argues in its Motion to Dismiss that the Court should dismiss this case by deciding, as a matter of law, that the RSA does not apply to DFA services.  It asserts that that the Court can make this determination because Kansas seeks permanent injunctive relief in its Complaint, not just preliminary relief pending arbitration.  The Army also made this argument at the February 23 preliminary injunction hearing, asserting the Court can and should decide whether the RSA or the JWOD applies, rather than consider simply whether Kansas is likely to prevail in arbitration.  The Army explained that it would not withdraw its dismissal motion, and explained to the Court why it believed the Court must decide the case on its merits, even in the context of the preliminary injunction.  The Army also argued that the Court must address the merits, and not simply permit the arbitration panel to decide them, because—according to the Army—to determine if the dispute is arbitrable the Court must first conclude whether the RSA applies.  But this is not what Congress said when it passed the RSA.

The RSA simply provides: "Whenever any State licensing agency determines that any department . . . of the United States that has control of the . . . operation . . . of Federal property is failing to comply with the [RSA] . . . such licensing agency may file a complaint with the [DOE's] Secretary . . . ."  20 U.S.C. § 107d-1(b).  No question exists about how this simple sentence applies to this dispute.

The Kansas Department for Children and Families, the State Licensing Agency in Kansas, has determined that the Department of the Army, who has control of the federal property at Fort Riley, has failed to comply with the RSA.  The Kansas State Licensing Agency thus invoked its right under §107d-1, filing a complaint with the DOE's Secretary.  The RSA also decides what happens next, again in simple terms:  the Secretary "shall convene a panel to arbitrate the dispute."  *Id.*  The record here established that the Secretary has done what this statute commanded him to do:  he began convening a panel to arbitrate the dispute between the Kansas State Licensing Agency and the Army.

The Army's argument would have the Court supplement this plain statutory language.  In the Army's view, the Court should insert itself into the process, deciding as a threshold matter whether the RSA even applies to the disputed contract.  But nothing in § 107d-1, the RSA, or any other federal law empowers the Court to assign itself such a role.  The RSA uses broad language to describe when the DOE's Secretary shall convene an arbitration panel.  "Whenever a State Licensing Agency determines that a federal agency or department has failed to comply with the RSA, it "may file a complaint" with the DOE's Secretary.  20 U.S.C. § 107d-1(b).  And when presented with such a complaint, the Secretary "shall convene a panel to arbitrate the dispute" presented by the State Licensing Agency's complaint.  *Id.*

None of this is to say that Kansas' complaint will prevail.  The RSA assigns that decision to the arbitrators empaneled by the Secretary.  In the end, they may find for Kansas, or they may find for the Army.  But the Court is not persuaded to insert itself as a threshold gatekeeper to the arbitral process when Congress did not assign that role to the federal courts.

The Army concedes that, by granting the preliminary injunction, the Court has provided Kansas with all the relief it has requested and addressed the merits of the Army's claims for

dismissal.  *See* Doc. 27 at 90 (February 23 Hearing Transcript). (stating that the Court will "address the merits as one of the factors in granting the preliminary injunction" and "regardless of whether you call it a preliminary injunction or a permanent injunction, at this stage the plaintiff will have attained all the relief it could get with a permanent injunction because" the Court determined it would "let the arbitration panel decide the merits of the case").  The Court already has found that Kansas meets the requirements for injunctive relief pending the arbitration panel's decision.  Therefore, Kansas has stated a claim upon which relief can be granted and the Court thus denies the Army's Motion to Dismiss.

### C.      Motion to Amend Complaint

Finally, the Court addresses Kansas' motion for leave to file an amended complaint (Doc. 16).  Under Fed. R. Civ. P. 15(a)(1) a party may amend its pleading once as a matter of course within 21 days after serving it or within 21 days after service of a Rule 12(b) motion.  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Here, Kansas cannot amend its Complaint as a matter of course and the Army objects to an amended complaint.  Thus, Kansas has asked the Court for leave to amend.

The Court has discretion to grant leave to amend.  *Bank Midwest, N.A. v. Millard*, No. 10-2387-JAR-DJW, 2012 WL 4006423, at *1 (D. Kan. Sept. 12, 2012) (citing *Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1462 (10th Cir. 1991)).  "In exercising its discretion, the court must be mindful that the Federal Rules of Civil Procedure are designed to facilitate decisions on the merits rather than on pleading technicalities."  *Id.* (citing *Koch v. Koch Indus.*, 127 F.R.D. 206, 209 (D. Kan. 1989)).  And, under Rule 15, "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bath faith or

dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

Kansas asks to amend its Complaint to remove its request for a permanent injunction. The majority of Kansas' Complaint refers to preliminary injunctive relief, but, ultimately, Kansas asks the Court for both preliminary and permanent injunctive relief, asking for "a preliminary injunction . . . until such time as the arbitration proceeding required by the [RSA] is concluded and "[f]ollowing the trial of this action, Kansas requests that this injunction be made permanent." Doc. 1 at 8. Kansas contends that "[d]espite the inartful wording, no injunction has been sought for a period longer than the conclusion of the arbitration process." Doc. 16 at 2. It contends the Court should grant leave to amend because "Kansas does not add any new claims, parties, or theories of liability" and, instead, only seeks to "clarify what relief it requests in this action." *Id.* Kansas asserts that granting this motion will not cause undue delay, prejudice, or injustice.

The Army opposes this motion. The Army contends the Court should deny Kansas' motion as untimely, unduly prejudicial to the Army, and futile. The Court addresses each of the Army's objections, below.

### 1. Timeliness

The Army argues that "[m]otions to amend should be made when the need to do so becomes apparent" and Kansas waited too long to file this motion. Doc. 19 at 2. It asserts that the Current Contract was set to expire on August 31, 2015 and it "voluntarily extended the contract to February 29, 2016, to allow litigation to proceed on the merits of whether the [RSA] applies." Doc. 19 at 3. The Army filed its Motion to Dismiss on September 25, 2015, which, as discussed above, was premised on Kansas' request for permanent injunctive relief. And Kansas did not file this motion to amend its Complaint until January 25, 2016. The Army argues that Kansas knew time was of the

essence since the contract was due to expire at the end of February 2016.  And the Army argues it was clear from its Motion to Dismiss that it "read the plain language of the Complaint as seeking permanent injunctive relief."  Doc. 19 at 4.  Thus, the Army asserts that Kansas "could have and should have clarified its position long before now" and the Court should require Kansas to show good cause for waiting four months to file its motion to amend.  Doc. 19 at 5.

The Army, however, admits it may not have been clear in its Memorandum in Support of its Motion to Dismiss that the permanent injunctive relief was important to the theory advanced by its Motion to Dismiss.  *See* Doc. 19 at 3–4.  It was important because the permanent relief Kansas requested presumed that the RSA applied to the contract and the Army's Motion to Dismiss challenged that presumption.  But the Army's Reply filed October 28, 2015 focuses on the permanent relief requested.  *See* Doc. 13 at 2.  And Kansas waited almost three months from the Army's Reply to file its motion to amend.

The Court agrees with the Army, in part.  Kansas could have sought leave to amend sooner.  But the Court nevertheless declines to deny Kansas' motion as untimely.  Kansas' Complaint contemplated arbitration of the dispute.  And, while requesting both preliminary and permanent relief, the Complaint states that Kansas had initiated the arbitration process and asks repeatedly for an injunction until the arbitration proceeding has concluded.  *See* Doc. 1 at 3, 6, 7, 8.  The Army objected to arbitration, urging this Court to resolve the dispute instead.  The Court considered the Army's arguments against a presumption that the RSA applies, and concluded the dispute must be arbitrated.  The amendment sought here does not add any new claims. Instead, it removes a request that the Court cannot consider until after arbitration concludes.  The Court declines to deny Kansas' motion for untimeliness.

### 2.  Unduly Prejudicial

The Army next argues the Court should deny the motion to amend because the amendment would be unduly prejudicial to the Army.  "For purposes of Rule 15, undue prejudice means undue difficulty in prosecuting or defending a lawsuit as a result of a change of tactics or theories on the part of the movant."  *Carefusion 213, LLC v. Prof'l Disposables, Inc.*, No. 09-2616-KHV-DJW, 2010 WL 4004874, at *4 (D. Kan. Oct. 12, 2010) (internal quotation and citation omitted).  "Courts have found that undue prejudice often occurs when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues."  *Id.* (internal quotation and citation omitted).

The Army argues that it "filed a thorough and timely motion to dismiss" in response to Kansas' request for permanent injunctive relief and, if the amendment requesting only preliminary relief will avoid a ruling on the motion to dismiss, the Army will suffer undue prejudice.  Doc. 19 at 5.  The Army asserts that it is unfair to allow Kansas to make this decision to amend "long after defendant devoted considerable resources to a motion to dismiss" and agreed to a six-month extension.  Doc. 19 at 9.  It claims that if it had known Kansas was seeking only preliminary injunctive relief, it never would have extended the contract or invested the time and resources defending the action for permanent relief.  The Army contends that "by having sought permanent relief, [p]laintiff opened the door to allowing [d]efendant to ask this Court to decide that the RSA does not apply as a matter of law."  Doc. 19 at 9.  The Army opposes amendment because it wants the Court to decide what law applies, not the arbitration panel.  The arbitration panel's decision will bind the Army and the Army will not have standing to appeal a decision against it.  Thus, if the Court allows Kansas to change the relief it seeks, the Army claims it is unduly prejudiced because its opportunity for any court to review a decision adverse to it is eliminated.

The Court declines to deny the amendment as an unduly prejudicial one.  The Army's motion to dismiss asserts virtually the same arguments it later used to oppose the preliminary injunction motion.  While the Army devoted considerable resources to the dismissal motion, this was not in vain as the Army used many of the same arguments to argue Kansas was unlikely to succeed on the merits in arbitration.  Despite the Army's argument that Kansas is not required to arbitrate before invoking the Court's jurisdiction (and that by also seeking a permanent injunction invoked the Court's jurisdiction over the substance of the dispute), Kansas' Complaint stated its desire for arbitration and that it had initiated the arbitration process.  While the parties disagreed whether arbitration had been convened and the Army wrote to the DOE objecting to the arbitration, the Army chose to extend the contract and pursue the Motion to Dismiss fully aware that Kansas sought arbitration under the RSA.  The permanent injunction language in the Complaint does not overshadow Kansas' clear desire for relief pending arbitration.  Moreover, the Court considered the Army's assertion that the RSA does not apply to DFA services contracts in the context of the preliminary injunction and determined that the law is not as transparent as the Army contends.  The Court understands the Army's desire to avoid arbitration, but the Court already has concluded that Congress mandated arbitration for this kind of dispute.

Here, the amendment does not create a new subject matter different from what was set forth in the Complaint.  Nor does it raise new factual issues.  And the Court finds that the Army does not face undue difficulty in prosecuting or defending the lawsuit as a result of the amendment.  After considering the parties arguments, the Court determined the dispute must be arbitrated and also found Kansas was entitled to a preliminary injunction pending the arbitration panel's decision.  The Court then denied the Army's Motion to Dismiss premised on those same arguments.  The Court thus declines to deny the amendment for undue prejudice.  Instead, the Court finds that leave to amend should be freely given.  The Army admits "regardless of whether you call it a preliminary

injunction or a permanent injunction" Kansas has "attained all the relief it could get with a permanent injunction because" the Court determined that it would "let the arbitration panel decide the merits of the case." *See* Doc. 27 at 90 (February 23 Hearing Transcript). So, the elimination of permanent injunction language from the Complaint does not prejudice the Army.

### 3. Futility

Last, the Army argues that amendment would be futile. "A proposed amendment is futile if the amended claim would be subject to dismissal." *Carefusion 213, LLC*, 2010 WL 4004874, at *5. The Army's futility argument is premised in part on the Army's assertion that arbitration had not been convened because it wrote to the DOE objecting to arbitration. However, at the February 23 preliminary injunction hearing, the evidence showed that the DOE since had responded to the Army's objections and "will move forward with the convening of this arbitration panel." Plaintiff's Exhibit 10 at 2 (admitted at the February 23 hearing). The Army also argues "[i]f changing the relief sought to seek only preliminary relief does not deprive the Court from ruling on [d]efendant's Motion [to Dismiss] then there is no point in allowing the amendment." Doc. 19 at 11. This argument is premised on the Army's success on the Motion to Dismiss and the Court's dismissal of the preliminary injunction claim. But, as explained above, the Court denies the Army's Motion to Dismiss and has granted Kansas' request for a preliminary injunction. Therefore, the amended claim for preliminary injunctive relief is not subject to dismissal. The Court thus declines to deny the amendment as futile.

In light of the above, the Court finds that the interests of justice are best served by allowing Kansas to amend its Complaint. The Court, in its discretion, thus grants Kansas leave to amend its Complaint. Kansas shall file its First Amended Complaint within seven (7) days of the date of this Order.

## IV.      Conclusion

For the reasons explained above and in the Court's Preliminary Injunction Order (Doc. 26), the Court concludes that the arbitration panel convened by the DOE shall decide whether the RSA applies to the Fort Riley contract and whether the Army has violated the RSA.  It thus grants Kansas a preliminary injunction pending the arbitration panel's decision.  The Court also grants the Army's Motion to Strike Plaintiff's Surreply, denies the Army's Motion to Dismiss, and grants Kansas' Motion for Leave to File First Amended Complaint for Preliminary Injunction.

This case is stayed pending arbitration.  The parties shall file a status report within six months after the date of this Order or promptly notify the Court of the arbitration's conclusion, whichever occurs first.

**IT IS THEREFORE ORDERED BY THE COURT THAT** this Order supplements the Court's Preliminary Injunction Order (Doc. 26).

**IT IS FURTHER ORDERED THAT** the Army's Motion to Dismiss (Doc. 7) is denied.

**IT IS FURTHER ORDERED THAT** the Army's Motion to Strike Plaintiff's Surreply to Defendant's Motion to Dismiss (Doc. 15) is granted.  While that Surreply (Doc. 14) will remain a part of the CM/ECF record in this case, the Court does not view it as part of the briefing on the Army's motion.

**IT IS FURTHER ORDERED THAT** Kansas' Motion for Leave to File First Amended Complaint for Preliminary Injunction (Doc. 16) is granted.  Within seven (7) calendar days of the date of this Order, Kansas shall file its First Amended Complaint for Preliminary Injunction (Doc. 16–1) as a separate docket entry in this case.

**IT IS FURTHER ORDERED THAT** this case is stayed pending arbitration.

**IT IS FURTHER ORDERED THAT** the parties shall file a status report on the progress of arbitration within six months from the date of this Order, or upon completion of the arbitration, whichever occurs first.

**IT IS SO ORDERED.**

**Dated this 22nd day of March, 2016, at Topeka, Kansas.**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**