## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, by and through the
KANSAS DEPARTMENT FOR CHILDREN
AND FAMILIES,

     Plaintiff,

v.

UNITED STATES, by and through
HONORABLE ASHTON B. CARTER,
Secretary of Defense, and HONORABLE
PATRICK J. MURPHY, Secretary of the
Army,

     Defendant,

and

SOURCEAMERICA and LAKEVIEW
CENTER, INC.,

     Intervenor Defendants.

Case No. 15-cv-04907-DDC-KGS

## MEMORANDUM AND ORDER

This case comes before the court on two motions.  First, the intervenor defendants,

SourceAmerica and Lakeview Center, Inc., have moved to dismiss for lack of jurisdiction and,

alternatively, to alter, amend, or vacate the preliminary injunction (Doc. 37).  Plaintiff Kansas

has filed its Memorandum in Opposition (Doc. 50) and intervenors have filed their Reply (Doc.

51).  Second, Kansas has requested leave to file a surreply brief (Doc. 55).  For reasons

explained below, the court denies the first motion, but grants the second.

## I.     The Intervenors

The dispute here involves two acts of Congress that govern services provided to the federal government: the Randolph-Sheppard Vending Facility Act of 1936 (commonly referred to as the "RSA") and the Javits-Wagner-O'Day Act (commonly, the "JWOD"). Earlier in this case, the court issued an injunction against the United States Army. This Order preliminary enjoined the Army from

> conducting any procurement, including making any award of contract in connection with cafeteria services at Fort Riley, except as permitted under the RSA and its regulations, until such time as the arbitration proceeding initiated by Kansas under the RSA is concluded, or further order modifying this preliminary injunction.

Docs. 26 at 7; 28 at 33. About a month later, SourceAmerica and Lakeview Center, Inc. ("intervenors") appeared and asked to intervene. *See* Doc. 32.

The court briefly expands on the facts of this case to explain how the intervenors fit in this dispute.[1] The JWOD requires the Army to procure services on the Procurement List from an AbilityOne designated qualified nonprofit agency. *See* 41 U.S.C. § 8504. Intervenor SourceAmerica is the central nonprofit agency designated by the AbilityOne Commission to help identify suitable nonprofit agencies employing persons with significant disabilities to provide the services on the Procurement List. *See* 41 U.S.C. § 8503(c) (explaining that a central nonprofit agency "facilitate[s] the distribution . . . of orders of the Federal Government for products and services on the procurement list among qualified nonprofit agencies").[2] SourceAmerica may charge and collect certain fees from facilitating those nonprofits' sales to the federal government.

---

[1]      *See* Doc. 28 at 2–13 for a detailed background of this case.

[2]      *See also* 41 C.F.R. § 51-1.3 (definition of central nonprofit agency); 41 C.F.R. § 51-3.1(b) (SourceAmerica (formerly known as NISH) represents nonprofit agencies employing persons with severe disabilities.); 41 C.F.R. § 51-3.2 (responsibilities of a central nonprofit agency).

*See* 41 C.F.R. § 51-3.5.  Intervenor Lakeview Center, Inc. ("Lakeview") is one such qualified nonprofit agency.

With Kansas' RSA contract with the Army set to expire on August 31, 2015, Fort Riley's contracting authorities approached SourceAmerica to see if the AbilityOne Commission wished to add Fort Riley's Dining Facility Attendant ("DFA")[3] services contract to the Procurement List under the JWOD.  And, on July 17, 2015, the AbilityOne Commission published the proposed addition of the DFA services to the Procurement List in the *Federal Register*, providing an opportunity for public comment.  This proposed addition listed Lakeview as the "Mandatory Source of Supply."  Less than a week later, on July 22, 2015, Kansas filed its Complaint (Doc. 1) here, seeking to enjoin the Army from conducting "any procurement of cafeteria services" until a Department of Education (DOE) arbitration proceeding under the RSA had concluded.  Doc. 1 at 6.  Then, the Army and Kansas agreed to extend their existing contract until February 29, 2016.  But the Procurement List process continued.  And, on January 22, 2016, the AbilityOne Commission approved the addition of DFA services to the JWOD Procurement List with an effective date of February 21, 2016.

When Kansas learned that the Army planned to move forward with procurement under the JWOD after the Fort Riley contract expired February 29, 2016, Kansas filed its Motion for Preliminary Injunction (Doc. 17) on February 3, 2016.  The court held a preliminary injunction hearing and issued the preliminary injunction described above on February 26, 2016.  The court also stayed the case pending further motions or the outcome of the arbitration proceeding.

Then, intervenors filed their Motion to Intervene (Doc. 32).  Though it questioned the timeliness of their request to intervene, the court granted intervenors' motion.  Intervenors since

---

[3]    *See* Doc. 28 at 6 n.3 (explaining that a DFA services contract is a type of military dining facility contract referred to in Army regulations that commonly involves cleaning and sanitation of the dining facility, among other things).

have asserted that the court erred by enjoining the Army, and this position relies on four principal arguments.

First, intervenors assert that our court has no business hearing this case.  They claim that Kansas has asserted what is, in essence, a bid protest and that, in the Tucker Act, Congress assigned exclusive jurisdiction over such challenges to the United States Court of Federal Claims.  No party had questioned subject matter jurisdiction before intervenors arrived and made this argument.  Naturally, questions about subject matter jurisdiction raise important issues for the federal courts—even when the challenge asserts that exclusive jurisdiction exists in some other federal court.  Since intervenors made this argument, the court has examined the issue closely.  As this Order explains, the court has concluded that the Tucker Act does not deprive this court of subject matter jurisdiction over the claims Kansas asserts here.

Second, intervenors contend, even if the Court of Federal Claims does not have exclusive jurisdiction, our court still cannot exercise jurisdiction until arbitration is exhausted because the RSA's exhaustion requirement is a jurisdictional prerequisite.  Again, neither of the original parties had made this jurisdictional argument.  The court thus considered the preliminary injunction request under Federal Rule of Civil Procedure 65 and its incidental equitable jurisdiction to preserve the status quo.  As explained below, the court concludes that it was proper to do so.  The RSA's arbitration provision is not jurisdictional and the court had discretion to excuse exhaustion and consider the preliminary injunction motion because an exception to exhaustion, irreparable harm, existed.

Third, intervenors argue that, even if it had jurisdiction to consider Kansas' preliminary injunction motion, the court applied the wrong legal standard.  They argue that Kansas must meet a heightened burden for a preliminary injunction because the injunction is a disfavored one.

4

Intervenors also assert that the only possible source of authority for an injunction comes from the All Writs Act, which required Kansas to shoulder a heightened burden.  Here again, intervenors make new arguments that no one advanced earlier when the parties litigated the injunction motion.  Nonetheless, the court closely has examined intervenors' new arguments.  And it now concludes—as similar cases have concluded—that the court has incidental jurisdiction to issue a status quo injunction under the traditional test governing preliminary injunction requests.

And last, intervenors argue that the court committed clear error by disregarding the 2015 NDAA Joint Explanatory Statement.  Months after they originally made this argument, intervenors informed the court of new developments under the NDAA.  *See* Doc. 58.  The court's original injunction Order considered the Joint Explanatory Statement in detail.  And the court is not persuaded that the new developments alter this analysis.

As the court noted in its original Order, the preliminary injunction's purpose is to preserve the status quo until the controversy's merits are tried.  *See* Doc. 28 at 13 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  But, throughout its existence, a preliminary injunction must satisfy the four equitable factors identified by our Circuit.  *See id.* at 13–14 (citing *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)).  If intervenors can show that changed circumstances nullify Kansas' capacity to prevail on all four factors, they may ask the court to vacate the injunction.

The court will begin by addressing Kansas' motion for leave to file a surreply.  Then, the court will address intervenors' jurisdictional and non-jurisdictional challenges to the preliminary injunction.

## II.   Kansas' Motion for Leave to File Surreply

On March 25, 2016, before the court had ruled on intervenors' Motion to Intervene (indeed, the same day intervention was sought), the intervenors prematurely filed their Motion to Dismiss for Lack of Jurisdiction and Motion to Alter, Amend, or Vacate Preliminary Injunction (Doc. 37).  Kansas, though opposing intervention, filed its Response to the dismissal motion on April 15, 2016.  And intervenors quickly filed their Reply (Doc. 51).  When the court granted intervention, Kansas moved for leave to file a surreply brief expanding upon its reasoning for opposing the dismissal motion (Doc. 55).

Kansas seeks leave to file a surreply because the ruling on the intervention motion focused on subject matter jurisdiction.  Kansas contends its Surreply, if allowed, would "address further whether this Court has subject matter jurisdiction" and help the court "fully consider [the] vital issues" about subject matter jurisdiction.  Doc. 55 at 2–3.

Under D. Kan. R. 7.1(a) and (c), parties are permitted to file a dispositive motion, a response, and a reply.  Generally, surreplies are not allowed.  *Mansoori v. Lappin*, No. 04-3241-JAR, 2007 WL 401290, at *1 (D. Kan. Feb. 1, 2007).  But the court may permit surreplies with leave of court in rare circumstances, *e.g.*, where a movant improperly raises new arguments in a reply.  *See id.*

Intervenors raised their subject matter jurisdiction challenges in their original motion, not in a reply.  Kansas thus knew about the jurisdictional arguments when it first filed its Response.  Still, the court will exercise its discretion and grant Kansas leave to file its Surreply because other circumstances justify a surreply here.

Although the court had not ruled yet on the motion to intervene, Kansas responded to intervenors' motions to dismiss and vacate.  Then, during the April 22 teleconference granting

6

intervention, the court emphasized its concern about the jurisdictional challenges raised by intervenors.  While it questioned the timeliness of the intervention motion, the court granted it nonetheless so that it could address the important dispute about subject matter jurisdiction.  For this same reason, the court also grants Kansas' motion for leave to file a surreply because it enhances the court's understanding of the "critical jurisdictional and substantive issues not previously identified for the Court" before intervention.  Doc. 32-1 at 13.[4]

The court concludes that a fuller briefing—one that includes the arguments in Kansas' Surreply—will serve the interests of justice and it thus grants Kansas' Motion for Leave to File Its Sur-Reply Brief (Doc. 55).

## III.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

Intervenors contend that the court lacks subject matter jurisdiction to decide the dispute presented in Kansas' Amended Complaint.  They assert that the court "has no jurisdiction or authority to block the Procurement List addition" because the Tucker Act confers exclusive jurisdiction on the United States Court of Federal Claims to decide this "bid protest."  Doc. 37-1 at 2–3.  Alternatively, intervenors contend that if the court's jurisdiction is "derivative of Kansas' arbitration claim under the [RSA,]" the court still lacks jurisdiction until Kansas exhausts its remedies available in an arbitration convened by the Secretary of the Department of Education. *Id.* at 10.  For reasons explained below, the court concludes that exclusive jurisdiction does not rest in the Court of Federal Claims and that our court had jurisdiction to issue the preliminary injunction.

---

[4]    Intervenors still had the last word on their motions to dismiss and vacate because their opposition to Kansas' motion for leave contained additional legal arguments.

## A.  Legal Standard

Federal courts must have a statutory or constitutional basis to exercise jurisdiction. *Davenport v. Wal-Mart Stores, Inc.*, No. 14-cv-2124-JAR-JPO, 2014 WL 3361729, at *1 (D. Kan. July 9, 2014).  And, without jurisdiction, a court must dismiss the case.  *Id.*; *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  Courts thus must determine, either *sua sponte* or upon a challenge by a party "at any stage in the litigation," whether subject matter jurisdiction exists. *Image Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (citation and internal quotation marks omitted); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (explaining that challenges to subject matter jurisdiction "may be raised . . . at any stage in the litigation, even after trial and the entry of judgment").  Plaintiff bears the burden to establish that jurisdiction exists and thus bears the burden to show why the court should not dismiss the case for lack of subject matter jurisdiction.  *Davenport*, 2014 WL 3361729, at *1; *see also Kinney v. Blue Dot Servs.*, 505 F. App'x 812, 814 (10th Cir. 2012) (explaining that the "court may not assume that a plaintiff can establish subject matter jurisdiction; it is the plaintiff's burden to prove it").

## B.  The Court of Federal Claims does not have exclusive jurisdiction over this action.

While this action's original parties never questioned the court's subject matter jurisdiction, intervenors assert that jurisdiction lies exclusively with the Court of Federal Claims. They contend that Kansas' claims "amount to a bid protest regarding the Army's procurement of the DFA services under the JWOD Act and thereby belong within the exclusive jurisdiction of the Court of Federal Claims" under the Tucker Act.  Doc. 37-1 at 6.  Kansas counters this argument by asserting that its challenge arises under the RSA and this action was filed to obtain

"an injunction to maintain the status quo while Kansas and the Army proceeded to [a] statutorily mandated arbitration" that will determine whether the Army has violated the RSA.  Doc. 50 at 2. Kansas contends that the court has incidental equitable jurisdiction to grant its request because the decision of an RSA arbitration panel is appealable to the court under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701 *et seq.*  While this controversy involves complex issues framed by often inscrutable statutory language, the court concludes that the Court of Federal Claims does not have exclusive jurisdiction.  The next three sections explain why.

### 1. The Tucker Act, the ADRA, and the Exclusive Jurisdiction of the Court of Federal Claims over Procurement Protests

The Tucker Act, 28 U.S.C. §1491, as amended by the Administrative Dispute Resolution Act of 1996 (the "ADRA"), vests jurisdiction over certain disputes exclusively with the Court of Federal Claims.  *See Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1246 (Fed. Cir. 2010).  As the statute itself explains, the Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement.

28 U.S.C. § 1491(b)(1).  Our Circuit has explained that a procurement "includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."  *Res. Conservation Grp., LLC*, 597 F.3d at 1244 (internal quotation and citation omitted).  An "interested party," as § 1491(b)(1) uses this term, means "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Wash. State Dep't of Servs. for the Blind v. United States*, 58 Fed. Cl. 781, 784 (2003) (internal quotation marks and citations omitted).  And, to establish a "direct economic interest,"

the potential bidder "'must establish that it had a substantial chance of securing the award.'" *Id.* (quoting *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)).

With the Tucker Act's amendment in 1996, § 1491(b) also conferred jurisdiction on federal district courts to hear procurement protests. But district court jurisdiction was extinguished in a sunset provision terminating district court jurisdiction on January 1, 2001. *See City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 907–10 (10th Cir. 2004) (explaining the ADRA's history and noting that § 1491(b)'s sunset provision has eliminated district courts' jurisdiction over procurement protest actions brought by interested parties under the ADRA). Since January 1, 2001, then, "district courts lack jurisdiction to hear government contract procurement protests brought by interested parties" under the Tucker Act. *Goodwill Indus. Servs. Corp. v. Comm. for Purchase from People who are Blind or Severely Disabled*, 378 F. Supp. 2d 1290, 1295–96 (D. Colo. 2005) (addressing jurisdictional question left open in *City of Albuquerque* and concluding that the ADRA's sunset provision eliminates APA jurisdiction over bid protests and "forbids the district courts from exercising jurisdiction in government contract procurement protests brought by disappointed bidders or potential bidders"); *Res. Conservation Grp., LLC*, 597 F.3d at 1242–43 ("The ADRA expanded the jurisdiction of the Court of Federal Claims to hear bid protest cases, ultimately giving th[at] court exclusive jurisdiction to review the full range of procurement protest cases previously subject to review in [both] the federal district courts and the Court of Federal Claims." (internal quotation and citation omitted)).[5]

---

[5]        *See also Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (explaining that "§ 1491(b) confers exclusive jurisdiction upon the Court of Federal Claims over bid protests against the government"); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001) ("It is clear that Congress's intent in enacting the ADRA with the sunset provision was to vest a single judicial tribunal with exclusive jurisdiction to review government contract protest actions."). *But see Iceland S.S. Co.-Eimskip v. United States Dep't of the Army*, 201 F.3d 451, 453 (D.C. Cir.) (allowing a

Intervenors here argue that Kansas' claims "fall squarely within the exclusive bid protest jurisdiction of the Court of Federal Claims under [§] 1491(b)(1)" of the Tucker Act.  Doc. 37-1 at 8.  They assert that Kansas is an interested party challenging a procurement purely subject to the JWOD because it "seeks to stop the Army from procuring DFA services at Fort Riley under the Procurement List."  *Id.*  Intervenors also contend that, since the AbilityOne Commission published notice in the *Federal Register* proposing the addition to the Procurement List *before* Kansas filed this action, the Court of Federal Claims has exclusive jurisdiction to consider Kansas' attempts to disrupt that JWOD procurement.  And intervenors argue that "[j]urisdiction cannot be predicated on the RSA . . . because Kansas' claims and the relief [it seeks] do not target the RSA; instead they seek to block the procurement of an item from the Procurement List."  Doc. 37-1 at 9.  In short, intervenors say, Kansas' lawsuit seeks to disrupt the procurement process and so the Tucker Act, as amended by the ADRA, forbids the court from hearing this dispute.

Kansas responds, asserting that publishing the proposed addition of the DFA services contract in the *Federal Register* just before Kansas filed this suit does not transform its claim into a procurement challenge under the JWOD.  Kansas argues that the Army, by initiating the process to place the DFA contract on the JWOD's Procurement List, violated the RSA because it ignored Kansas' right to priority under that act.  And so, Kansas explains, it initiated arbitration under the RSA.  Kansas also notes that the RSA authorizes a state licensing agency to initiate such an arbitration "[w]henever [it] determines that" the government has failed to comply with

---

disappointed bidder to "challenge a government contract under the [APA]" in district court after the passage of the ADRA, but doing so before the sunset provision took effect and without addressing the ADRA), *cert. denied*, 529 U.S. 1112 (2000); *cf. NISH v. Rumsfeld*, 188 F. Supp. 2d 1321, 1322 (D.N.M. 2002) (invoking subject matter jurisdiction under the APA without addressing whether the Court of Federal Claims should have exclusive jurisdiction under the ADRA where NISH (now called SourceAmerica) claimed that the JWOD applied to a contract and the state licensing agency argued that both the JWOD and the RSA apply, but the RSA governs).

the RSA or its regulations.  *See* 20 U.S.C. § 107d-1(b).  Kansas, a state licensing agency,

initiated a DOE arbitration on May 7, 2015—about two months before the AbilityOne

Commission published the Fort Riley DFA services contract in the *Federal Register*.  In short,

Kansas argues that the arbitration panel first must decide whether an RSA violation has occurred

before any dispute within the scope of the Tucker Act's § 1491(b) may go forward.

        This summary of the parties' competing positions exposes the issue at the heart of the

subject matter jurisdiction dispute.  On one hand, the Tucker Act uses expansive language to

describe disputes that only the Court of Federal Claims can hear.  Namely, only that court can

hear an objection by any interested party "to a solicitation . . . for bids or proposals" for a

proposed Federal agency contract, to an "award of" such a contract, or—most expansively yet—

"any alleged violation" of any statute or regulation "in connection with" any such procurement

or proposed procurement.[6]  28 U.S.C. § 1491(b)(1).  But the RSA uses equally expansive

language to confer arbitration rights on state licensing agencies.

        Namely, the RSA empowers any state licensing agency—a status Kansas indisputably

occupies—to seek relief in a DOE arbitration "[w]henever" it "determines that" a federal agency

has failed to comply with the RSA or its regulations.  20 U.S.C. § 107d-1(b).  The subject matter

jurisdiction dispute here requires the court to discern where jurisdiction exists for the dispute

presented in Kansas' Amended Complaint.  As explained below, the Federal Circuit has

concluded that, when a state licensing agency alleges an RSA violation, the Court of Federal

---

[6]        For purposes of this Order, the court assumes that the current dispute fits within the language of §
1491(b).  The court need not analyze in detail whether Kansas is an "interested party" raising one of the
objections described because, as the court will explain, even if the dispute can be classified as a Tucker
Act procurement protest, the Court of Federal Claims' jurisdiction is preempted.

Claims does not have exclusive jurisdiction.  Instead, that court held, its jurisdiction is preempted and the dispute first must be arbitrated under the RSA.

### 2. Court of Federal Claims Jurisdiction when an RSA Violation is Alleged

In 2005, the Federal Circuit held that, when a complaint alleges a violation of the RSA, the Court of Federal Claims lacks Tucker Act jurisdiction to hear the case until the RSA's administrative remedy—arbitration—is exhausted.  *See Kentucky v. United States*, 424 F.3d 1222, 1225–29 (Fed. Cir. 2005).  While *Kentucky* did not involve two competing federal acts like the RSA and the JWOD here, the Federal Circuit's analysis there is instructive and, in the Court's judgment significantly guides the correct analysis.

In *Kentucky*, the Army solicited bids for a DFA services contract under the RSA.  *Id.* at 1223–24; *Kentucky v. United States*, 62 Fed. Cl. 445, 449 (2004).  And, when the Kentucky state licensing agency's contract was not deemed within a "competitive range," the state licensing agency filed a post-award bid protest action in the Court of Federal Claims asserting jurisdiction under the Tucker Act.  *Kentucky*, 424 F.3d at 1224; *Kentucky*, 62 Fed. Cl. at 452.  The Court of Federal Claims, however, held that the state licensing agency was "required to exhaust its administrative remedies . . . by asking the Secretary of Education to convene an arbitration panel to resolve the dispute" because the state licensing agency's claim arose under the RSA. *Kentucky*, 424 F.3d at 1224.  And *Kentucky* concluded that it lacked jurisdiction over the state licensing agency's claim until that RSA remedy was exhausted.  *Id.*

On appeal, the state licensing agency argued that its complaint "did not raise a claim under the RSA," but merely presented a procurement challenge under the Tucker Act and thus need not be arbitrated under the RSA.  *Id.*  The Kentucky state licensing agency also contended that, even if the claim fell "within the scope of the RSA, arbitration is not mandatory . . . , but is

13

. . . optional" because § 107d-1(b) says a state licensing agency *may* file a complaint.  *Id.*  The

Federal Circuit affirmed the Court of Federal Claims' decision, but construed the RSA's

arbitration provisions "more narrowly than the trial court [had]."  *Id.* at 1227.

The Court of Federal Claims had found that, if a complaint has a "reasonable nexus" to

the RSA, arbitration is required before the court has jurisdiction.  *Id.* at 1224.  The Federal

Circuit, however, found that "[o]nly when the state licensing agency determines that the federal

agency 'is failing to comply with the provisions of [the RSA] or any regulations issued

thereunder' is arbitration allowable."  *Id.*  at 1225 (quoting 20 U.S.C. § 107d-1(b)).  The Federal

Circuit noted that the "arbitration panel may act only if 'it finds that the acts or practices of any

[federal agency] are in violation of [the RSA.]'"  *Id.* (quoting 20 U.S.C. § 107d-2(b)).

"Accordingly, not every complaint that a state licensing agency may have against a federal

agency is arbitrable, *but only those complaints that allege a violation of the RSA or its attendant*

*regulations*."  *Id.*  (emphasis added); *see also id.* at 1226 ("For claims relating to procurement

disputes *not based on the RSA and its regulations*, there would be no reason to bypass

conventional bid protest and federal contract remedies in favor of arbitration by panels convened

by the Secretary of Education.").  Because the state licensing agency's complaint in *Kentucky*

alleged that it was entitled to the contract under the RSA, the Federal Circuit agreed that the

claim fell within the scope of the RSA's arbitration provision.  *Id.* at 1227.  And although

§ 107d-1(b) of the RSA uses the word "may," the Federal Circuit held that arbitration under the

RSA is not a permissive remedy.  *Id.* at 1227–28.  It is the required remedy.  *Id.*  The Federal

Circuit thus concluded the Court of Federal Claims could not exercise Tucker Act jurisdiction

over the Kentucky state licensing agency's bid protest.  *Id.* at 1228–29 (discussing how

Congress' "comprehensive [arbitration] scheme for the administration of disputes arising from

violations of the RSA" was intended to be exclusive and listing a number of federal court decisions concurring that arbitration is mandatory).

Here, Kansas' Amended Complaint explicitly accuses the Army of violating the RSA. It asserts that the Army did so by requesting the AbilityOne Commission to add the DFA services to the Procurement List, which eliminated Kansas' right to compete for the services under the RSA's priority bidding procedures. *See* Doc. 29 at 3.[7] The Amended Complaint also asserts that Kansas has demanded an RSA arbitration to establish "a determination that Fort Riley's actions violate the [RSA.]" *Id.* at 5. And Kansas' letter to the DOE requesting arbitration asserts that the Army's "attempt to remove the contract for DFA services from the [RSA] priority is a violation of the [RSA] and is improper." Doc. 12-3 at 2. In *Kentucky*, the Federal Circuit concluded that a dispute alleging an RSA violation must be arbitrated and the Court of Federal Claims lacks Tucker Act jurisdiction to hear this dispute, even if the dispute, by its terms, also fits within § 1491(b) as a procurement protest.

The court reaches the same conclusion here. Kansas' Amended Complaint has alleged an RSA violation and thus the Court of Federal Claims' lacks jurisdiction to hear it. This is so even though Kansas' claims also may fit within the provisions of § 1491(b) of the Tucker Act. As in *Kentucky*, a DOE arbitration panel first must decide whether the Army has violated the RSA before the Court of Federal Claims may exercise jurisdiction over any remaining procurement dispute.

Intervenors persist, arguing that this case also involves the JWOD, and so jurisdiction exists in the Court of Federal Claims and nowhere else. As explained below, the involvement of the JWOD does not alter the court's conclusion that the Court of Federal Claims does not have exclusive jurisdiction.

---

[7]    Kansas' original Complaint contains identical language. *See* Doc. 1 at 3.

### 3. Court of Federal Claims Jurisdiction When a Dispute Involves Both the RSA and Another Federal Act

*Kentucky* involved a contract solicited under the RSA and no one disputed that the RSA applied to the contract.  Here, the facts differ because the Army and intervenors contend that the JWOD, not the RSA, applies to the DFA services contract at issue.  The parties focus some of their arguments on when the procurement process began, *i.e.*, when the DFA services were published as a proposed addition to the JWOD Procurement List, and when Kansas initiated this lawsuit.  Essentially, intervenors argue that arbitration became unavailable—at the latest—once the AbilityOne Commission published the proposed addition in the *Federal Register*.  They contend that once the contract was solicited under the JWOD, the Court of Federal Claims had exclusive jurisdiction.  Kansas, on the other hand, argues that it may arbitrate the dispute because it initiated arbitration before the first publication occurred in the *Federal Register*.  The court is not persuaded by either argument.  *Kentucky* holds that the Court of Federal Claims lacks Tucker Act jurisdiction whenever a state licensing agency alleges an RSA violation.  Neither the involvement of the JWOD nor the timing of the parties' actions affects this principle. [8]

Kansas objects to the awarding contract from the JWOD Procurement List *because* it claims the Army violated its RSA priority by proposing that the DFA services be added to the Procurement List.  And, the RSA provides for arbitration *whenever* the state licensing agency determines that a federal agency has failed to comply with the RSA or its regulations.  *See* 20 U.S.C. § 107d-1(b).  Not only is arbitration available to Kansas, *Kentucky* holds that it is required when a state licensing agency alleges an RSA violation, as Kansas does here.  *See Kentucky*, 424 F.3d at 1227, 1229 (concluding that where a "complaint is premised on a violation

---

[8]     Indeed, though intervenors argue that the Court of Federal Claims has exclusive jurisdiction, they admit elsewhere in their motion that the facts of *Kentucky* are similar in many respects to the facts presented in this case.  *See* Doc. 37-1 at 11.

of the RSA, it falls within the scope of the arbitration provisions" of the RSA and that RSA

arbitration is mandatory).

In *Kentucky*, the Court of Federal Claims considered earlier procurement cases involving

the RSA and another federal act under Tucker Act jurisdiction.  For example in *Mississippi*

*Department of Rehabilitation Services v. United States*, 61 Fed. Cl. 20 (2004), and *Washington*

*State Department of Services for the Blind v. United States,* 58 Fed. Cl. 781 (2003), the Court of

Federal Claims exercised jurisdiction under § 1491(b) over disputes about whether the RSA or

the Small Business Administration Act should apply to a contract.  But these cases under

§ 1491(b) not only predated the Federal Circuit's binding authority in *Kentucky*, they also did not

directly address the jurisdictional question before the court now, *i.e.*, whether an arbitration panel

must resolve a claimed RSA violation before the Court of Federal Claims can exercise

jurisdiction under the Tucker Act.[9]

---

[9]        Intervenors argue in their brief that cases that do not involve the JWOD Procurement List
procedure cannot support the court's exercise of jurisdiction.  *See, e.g.*, Doc. 37-1 at 10 (claiming that the
"Sixth Circuit's decision in *Kentucky v. Hagel*, 759 F.3d 588 (6th Cir. 2014), does not support this court's
exercise of jurisdiction" because that case did not involve the JWOD); *see also Hagel*, 759 F.3d at 600
(holding that a federal district court has jurisdiction to consider a state licensing agency's request for a
preliminary injunction pending an RSA arbitration panel's determination of a dispute whether the RSA
applies to a contract or, instead, could be set aside under the Small Business Administration Act).  But,
just as intervenors argue that the JWOD falls within the Tucker Act, so do disputes involving
procurements under the Small Business Administration Act.  *See, e.g.*, *Mississippi Dep't of Rehabilitation*
*Servs. v. United States*, 61 Fed. Cl. 20, 22 (2004).  And intervenors cite no authority for their argument
that, because this case purportedly is a Tucker Act dispute involving the JWOD instead of another act like
the Small Business Administration Act, the availability of RSA arbitration evaporates.  Intervenors' own
arguments contradict their position.

        None of the cases intervenors cite for their argument that the Court of Federal Claims
"indisputably" has exclusive jurisdiction involved the RSA.  *See* Doc. 37-1 at 10 (citing *Goodwill Indus.*
*Servs. Corp. v. Comm. for Purchase from People who are Blind or Severely Disabled*, 378 F. Supp. 2d
1290, 1297–98 (D. Colo. 2005); *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 239–41
(2010)).  If the court were to accept intervenors' argument that cases must involve the exact same federal
acts to support arguments for jurisdiction, it only could consider cases involving the JWOD *and* the RSA,
as Kansas' claims here implicate both acts.  Instead, the court finds such cases are analogous and support
Kansas' argument that the Court of Federal Claims does not have exclusive jurisdiction.

In *Mississippi Department*, it appears no party ever even requested arbitration. *See Miss. Dep't of Rehab. Servs.*, 61 Fed. Cl. at 22–31 (2004). *Kentucky* pointed out that *Mississippi Department* "simply assumed that jurisdiction existed over RSA contract or bid protest actions absent exhaustion probably because neither of the parties raised the jurisdictional issue" *See Kentucky*, 62 Fed. Cl. at 459 n.11. And, *Kentucky* found that *Mississippi Department* never addressed the "jurisdictional implications of the RSA arbitration procedures." *Id.* (citations omitted).

In *Washington State*, the Court of Federal Claims exercised jurisdiction because it found the state licensing agency could elect to file a bid protest under the Tucker Act *or* request arbitration under the RSA. *Wash. State Dep't of Servs. for the Blind,* 58 Fed. Cl. at 786. This case noted that "[t]he parties have not challenged this court's jurisdiction to hear [the state licensing agency's] complaint notwithstanding RSA's provision of the administrative remedy of arbitration." *Id.* at 786 n.8. And yet, *Washington State* believed it had jurisdiction under *Texas State Commission for the Blind v. United States*, 796 F.2d 400 (Fed. Cir. 1986), which had found the RSA's arbitration provisions permissive. *Kentucky* questioned *Washington State*'s conclusion that it had jurisdiction over the dispute and noted that *Washington State* had addressed its jurisdiction in light of the RSA "only in passing." *See Kentucky*, 62 Fed. Cl. at 461. Directly addressing jurisdiction in *Kentucky*, the Court of Federal Claims and the Federal Circuit both concluded jurisdiction in the Court of Federal Claims was missing where an RSA violation was alleged. *Kentucky*, 62 Fed. Cl. at 459–63 (rejecting *Texas State* and *Washington State*'s conclusions that arbitration under the RSA is permissive); *Kentucky*, 424 F.3d at 1229 (discussing and rejecting the dictum in *Texas State* which had found RSA arbitration permissive

and holding that, when claims are brought under the RSA, arbitration is mandatory and the Court of Federal Claims lacks jurisdiction).

Also, the state licensing agency in *Kentucky* advanced an argument analogous to intervenors' position here—it argued that "because it is the procurement award process that is challenged the claim becomes by definition a Tucker Act bid protest action and the RSA priority only kicks in *after* the procurement award issues are resolved." *Kentucky*, 62 Fed. Cl. at 462 (emphasis added). The *Kentucky* court rejected this argument directly, reasoning:

> [w]ere the court to address [the state licensing agency's] claim on the merits, it may have no alternative but to construe the applicable RSA provisions and regulations promulgated thereunder to determine whether to enforce the [RSA]'s priority mandate. Simply put, a court ruling on the . . . procurement award issues could potentially become intertwined with the RSA's priority scheme, the applicability of which Congress intended the arbitration panel to initially determine. The claim . . ., therefore, ought to be submitted to the DOE's arbitration panel in its entirety despite the fact that general matters of procurement law may be involved, which might, hypothetically, resolve the dispute without reference to the RSA's priority scheme.

*Id.*

The court reaches the same conclusion here. If our court or the Court of Federal Claims were to address the merits of Kansas' claim, it would have to construe the RSA provisions and regulations to determine whether the Army, in fact, had violated the RSA's priority mandate. Kansas contends that the RSA and its regulations apply to the contract for DFA services because the contract is one for operating a cafeteria, or at a minimum, is a contract pertaining to operating a cafeteria.[10] Kansas alleges that the Army violated the RSA and its regulations by soliciting the contract under the JWOD, which circumvented giving Kansas RSA priority in the bidding process. Determining the merits of this claim, while it occurred in a larger context about a

---

[10]     *See* 20 U.S.C. § 107(a)-(b) (explaining that licensed blind persons are authorized "to operate vending facilities" and "priority shall be given to blind persons" for the "operation of vending facilities"); 34 C.F.R. § 395.33(c) (RSA regulation discussing contracts "pertaining to the operation of" cafeterias on Federal property).

procurement and also involves the JWOD, will involve construing the RSA and its regulations to determine if Kansas is entitled to priority under the RSA.  "'Surely Congress contemplated that disputes between state [licensing] agencies and government agencies could involve contract awards, such as the one at issue here.  Congress nevertheless set up an arbitration scheme instead of authorizing direct resort to federal court.'"  *Kentucky*, 62 Fed. Cl. at 462 (quoting *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 103 (D.C. Cir. 1986)).  In sum, the underlying procurement at issue here is intertwined with the RSA's priority scheme and the RSA aspect of the dispute was submitted to an RSA arbitration panel to determine whether the Army has violated the RSA.  *See id.* at 462–63; *see also* Doc. 28 at 10, 26 n.7, 30, 43 (discussing the DOE's determination—over the Army's objections—that it was appropriate to convene arbitration for this dispute).

Indeed, since *Kentucky*, the Court of Federal Claims has considered whether it has jurisdiction over a dispute similar to the one presented here.  Contrary to intervenors' argument, the Court of Federal Claims in *Colorado Department of Human Services v. United States*, 74 Fed. Cl. 339 (2006), held that it lacks jurisdiction.  There, the Court of Federal Claims decided whether it had jurisdiction to entertain a motion for a preliminary injunction pending the outcome of an RSA arbitration proceeding.  The state licensing agency had operated a dining facility at Buckley Air Force Base under an RSA contract.  *Colorado Dep't*, 74 Fed. Cl. at 341.  Then, the Air Force decided to eliminate that contract and, instead, planned to operate the space as a sports bar using Air Force employees.  *Id.* at 341–42.  When the state licensing agency tried to invoke RSA priority to operate the reopened facility, the Air Force responded that the facility was no longer a vending facility under the RSA.  *Id.* at 342.  The state licensing agency asked the Secretary of the DOE to convene an RSA arbitration proceeding "to determine the applicability

of the [RSA] to the proposed operation of the new dining facility." *Id.* It also filed suit in the Court of Federal Claims requesting a preliminary injunction requiring the Air Force to maintain the status quo pending the decision of an RSA arbitration panel. *Id.* But, the Air Force moved to dismiss the suit for lack of subject matter jurisdiction. *Id.* at 343.

The Court of Federal Claims examined its jurisdiction and explained that it now is "the exclusive judicial forum for bid protests actions" under § 1491(a) and (b) of the Tucker Act. *Id.* at 344, 344 n.4. It also examined the RSA and its scheme for resolving disputes by arbitration, subject to review as a final agency action under the APA. *Id.* at 344–45. The court considered the Federal Circuit's holding in *Kentucky* as guidance on this situation, one where the Air Force had determined that the RSA did not apply and both Tucker Act jurisdiction and arbitration might apply to the dispute. *See id.* at 345. The Court of Federal Claims reached the same conclusion that this court reaches here—after *Kentucky*, "a plaintiff alleging a violation of the [RSA] must . . . complete the arbitration process . . . before a court can exercise jurisdiction over its substantive claims." *Id.* Because Colorado's state licensing agency had alleged an RSA violation, the Court of Federal Claims held that "the specific and comprehensive scheme provided by Congress [in the RSA] preempts any Tucker Act jurisdiction that might otherwise exist" and arbitration was thus required. *Id.* at 349.

When discussing arbitration, *Colorado Department* concluded, in contrast, that arbitration is not required in two situations:  (1) where the state licensing agency does not allege an RSA violation as part of a procurement protest; and (2) when a disappointed bidder who is not a state licensing agency "challenges the application of the [RSA] priority to an awarded contract." *Colorado Dep't*, 74 Fed. Cl. at 345. Neither of those exceptions applied there, and they likewise do not apply here. And *Colorado Department* confirms that, after *Kentucky*,

21

arbitration is required—even where the government agency has decided that the RSA does not apply. The Court of Federal claims does not have exclusive jurisdiction over the present dispute. And until arbitration is complete, the Court of Federal Claims' Tucker Act jurisdiction is preempted.

The *Colorado Department* court also considered whether the Court of Federal Claims, though lacking Tucker Act jurisdiction, had jurisdiction on some other basis to permit a status quo-preserving preliminary injunction pending the arbitration panel's decision. It held that "[t]he power to enter a preliminary injunction pending the resolution of an administrative proceeding is 'merely incidental to the courts' jurisdiction to review final agency action . . . .'" *Colo. Dep't of Human Servs.*, 74 Fed. Cl. at 347 (quoting *Arrow Trans. Co. v. S. Ry. Co.*, 372 U.S. 658, 671 n.22 (1963)). "'[I]f a court may eventually have jurisdiction of the substantive claim, the court's incidental equitable jurisdiction . . . gives the court authority to impose [a] temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review.'" *Id.* (quoting *Jackson v. Dist. of Columbia*, 254 F.3d 262, 268 (D.C. Cir. 2001) (further quotation and citation omitted)). So, the Court of Federal Claims considered whether it would eventually have jurisdiction to "review the arbitration panel's decision at the conclusion of the arbitration proceedings." *Id.*

*Colorado Department* looked to the RSA's literal terms for guidance. *See id.* at 347. Section 107d-2(a) provides that an arbitration panel decision is "'subject to appeal and review as a final agency action for purposes of chapter 7 of . . . Title 5.'" *Id.* (quoting 20 U.S.C. § 107d-2). The RSA thus provides for review under the APA, 5 U.S.C. §§ 701 *et seq*. *Id.* And the court recognized that it could not exercise APA review jurisdiction over the preliminary injunction request because the Federal Circuit has held that "the [Court of Federal Claims] 'lacks APA

jurisdiction.'" *Id.* (quoting *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (en banc)).  Accordingly, the Court of Federal Claims held that it "lack[ed] jurisdiction under both the APA and the Tucker Act" to review an RSA arbitration panel's decision and it thus completely "lack[ed] jurisdiction to entertain plaintiffs' motion for a preliminary injunction pending the outcome" of that proceeding.  *Id.*  Here, too, the Court of Federal Claims does not have exclusive jurisdiction because it lacks jurisdiction under both the APA and the Tucker Act.

In sum, the court finds that Kansas properly initiated arbitration under the RSA, even though the dispute also may fit within the terms of § 1491(b) (or someday present a Tucker Act bid protest under that provision).  Because Kansas alleges an RSA violation, any Tucker Act jurisdiction is preempted until arbitration is complete and the Court of Federal Claims thus does not have exclusive jurisdiction over Kansas' claims.

### C.  This court had jurisdiction to consider the preliminary injunction motion.

Deciding to reject intervenors' argument under the Tucker Act does not end the jurisdictional analysis, for they raise two more jurisdictional challenges.  Before turning to the substance of those arguments, the court emphasizes the substance of the claims asserted in Kansas' Amended Complaint.  The Amended Complaint does not ask the court to decide the merits of Kansas' RSA claim.  Instead, it merely asks for a preliminary injunction that preserves the status quo until an RSA arbitration proceeding can decide whether the Army violated the RSA, as Kansas contends.  This is the claim that the court must have subject matter jurisdiction to decide.

The first of these additional jurisdictional challenges asserts that Kansas had not initiated an RSA arbitration when it filed this action and so, no subject matter jurisdiction can exist.  This argument easily is dispatched because intervenors simply are wrong.  Kansas filed a complaint

with the Secretary of the DOE for an RSA arbitration in May 2015. Kansas filed this suit two months later, in July 2015.

Intervenors' second argument is more complicated. They contend that, because exhausting the arbitration remedy under the RSA is mandatory, the court is precluded not only from deciding the merits of Kansas' claims but also from exercising jurisdiction to issue a preliminary injunction until Kansas has exhausted arbitration. In other words, intervenors argue that the RSA's arbitration requirement erects a complete jurisdictional bar. *See* Docs. 37-1 at 10–12, 51 at 5–6. Kansas counters, arguing that the RSA's exhaustion requirement is non-jurisdictional and the court thus may excuse exhaustion to grant injunctive relief to preserve the status quo pending its review of the arbitration panel's decision. *See* Doc. 50 at 9–11. The answer to this question depends on the type of exhaustion required by the RSA.

The cases recognize two types of exhaustion requirements—non-jurisdictional exhaustion and jurisdictional exhaustion. Non-jurisdictional exhaustion is "a judicially created doctrine requiring parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004). If the exhaustion requirement is "non-jurisdictional," a district court "may, in its discretion, excuse exhaustion if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *Id.* (internal quotations and citations omitted). Jurisdictional exhaustion exists "when Congress requires resort to the administrative process as a predicate to judicial review." *Id.* Where Congress has required jurisdictional exhaustion, courts cannot excuse the exhaustion requirement. *Id.*

Determining which type of exhaustion requirement exists "is purely a question of statutory interpretation." *Id.* Non-jurisdictional exhaustion is presumed, unless "Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision." *Id.* at 1248 (citation and internal quotation marks omitted). To find a jurisdictional exhaustion requirement, "the statue must contain '[s]weeping and direct statutory language indicating that there is no federal jurisdiction prior to exhaustion . . . .'" *Id.* (quoting *Weinberger v. Salfi*, 422 U.S. 749, 757 (1975) (further quotation and citation omitted)).

The relevant provision here, § 107d-1(b) of the **Randolph-Sheppard Act**, provides:

> Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder (including a limitation on the placement or operation of a vending facility as described in section 107(b) of this title and the Secretary's determination thereon) *such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.*

20 U.S.C. § 107d-1(b) (emphasis added). And, § 107d-2(a) provides that such panel's decision is "subject to appeal and review as a final agency action for purposes of chapter 7 of . . . Title 5." As already discussed in part III.B.2 of this Order, and despite the "may" in § 107d-1(b), courts have concluded that state licensing agencies must arbitrate such claims and they have no option to pursue their substantive claims in court. The RSA's arbitration provision thus is an exhaustion requirement and requires claimants to arbitrate disputes arising under the RSA. But this conclusion does not end the discussion, and the court still must decide whether it has the power to excuse this exhaustion requirement and consider Kansas' preliminary injunction request, *i.e.*, it must determine whether the exhaustion requirement is non-jurisdictional or jurisdictional.

As explained below, courts have approached the RSA's exhaustion requirement and a court's capacity to enter a preliminary injunction pending arbitration in a few different ways, and they have not always distinguished between "jurisdictional" and "non-jurisdictional" exhaustion. But, after considering the various approaches described below, the court concludes that the RSA's exhaustion requirement is non-jurisdictional. This means it had discretion to excuse exhaustion and exercise jurisdiction over Kansas' request for a preliminary injunction.

### 1.  *Colorado Department of Human Services v. United States*

In *Colorado Department*, the state licensing agency agreed that the RSA requires exhaustion and did not contend that any exception to exhaustion applied. 74 Fed. Cl. at 346. Instead, the state licensing agency contended that the federal court possessed incidental power to issue a preliminary injunction and this power was separate from, and did "not conflict with[,] the exhaustion requirement." *Id.* at 346–47 (describing a court's ability to enter a status quo-preserving preliminary injunction "pending the resolution of an administrative proceeding" as "'merely incidental' to the court[']s jurisdiction to review final agency action" (quoting *Arrow Trans. Co. v. S. Ry. Co.*, 372 U.S. 658, 671 n.22 (1963)).

*Colorado Department* relied on a D.C. Circuit opinion where the district court had exercised jurisdiction over the merits of an RSA claim, after finding plaintiffs qualified for the futility exception to the exhaustion requirement. *See id.* (citing *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 92–93 (D.C. Cir. 1986)). On appeal, the D.C. Circuit held that plaintiffs did not qualify for any exceptions to the RSA's exhaustion requirement. *Weinberger*, 795 F.2d at 111. And thus, the D.C. Circuit dismissed the case because plaintiffs had failed to exhaust their arbitration remedies. *Weinberger*, 795 F.2d at 110. But, in *dicta*, the D.C. Circuit also "endorsed the availability of a preliminary injunction pending the outcome of the arbitration

26

proceedings." *Colorado Department*, 74 Fed. Cl. at 346 (citing *Weinberger*, 795 F.2d at 110).

Indeed, in *Weinberger* the D.C. Circuit stated that "[i]nstead of seeking a decision on the merits,

appellants should have sought a stay or an injunction against the contract awards pending

arbitration." *Weinberger*, 795 F.2d at 110 (citations omitted).

    *Colorado Department* explored this incidental power mentioned in *Weinberger*.  74 Fed.

Cl. at 346 n.5.  It cited *Jackson v. District of Columbia*, 254 F.3d 262, 268 (D.C. Cir. 2001),

which had noted that a court need not "address whether an exception to the exhaustion

requirement applies" when a preliminary injunction is sought to maintain the status quo pending

completion of administrative proceedings because "'federal courts possess a traditional power to

issue injunctions to preserve the status quo while administrative proceedings are in progress and

prevent impairment of the effective exercise of appellate jurisdiction.'" *Id.* (quoting *Jackson*,

254 F.3d at 268).

    Based on *Weinberger* and *Jackson, Colorado Department* found that the incidental power

to enter an injunction was not technically an "exception" to the exhaustion requirement because,

when an "exception" applies, a court may address "the ultimate merits of the plaintiff's claims."

*Id.*  Instead, when a status quo-preserving injunction is requested, "the plaintiff must still pursue

its administrative remedies."  *Colorado Department* thus concluded that the ability to issue a

preliminary injunction was separate from the exhaustion requirement, and it went on to consider

whether to issue the preliminary injunction.  *See id.* at 347.[11]

---

[11]    Still, in *Colorado Department*, the court concluded it lacked jurisdiction to enter a preliminary injunction.  *See supra* part III.B.3.  Only a court with jurisdiction to review an arbitration panel's decision has incidental jurisdiction required to issue a preliminary injunction.  And because the Court of Federal Claims lacked APA jurisdiction to review an arbitration panel's decision it also lacked power to issue an injunction pending that outcome.  *See id.*; *see also Colorado Dep't*, 74 Fed. Cl. at 347–48.

## 2.   *Jackson v. District of Columbia* **and** *Wagner v. Taylor*

The *Jackson* case cited in *Colorado Department* analyzed a court's ability to issue a preliminary injunction where a statute's language requires administrative exhaustion.  In doing so, it relied on another D.C. Circuit case, *Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987).  Like the RSA cases *Hagel* and *Johnson*—discussed next—*Jackson* and *Wagner* analyzed the statutory text establishing the exhaustion requirement to determine if a preliminary injunction was appropriate.  *Jackson* involved the Prison Litigation Reform Act (the "PLRA"), and *Wagner* involved Title VII.  But the court finds their analysis nonetheless instructive.

The PLRA explicitly requires exhaustion before permitting a prisoner to seek relief in court.  *Jackson*, 254 F.3d at 264–65 (exhaustion requirement stating that "'[n]o action . . . be brought with respect to prison conditions under . . . any . . . Federal law[ ] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted'" (quoting 42 U.S.C. § 1997e(a))).  The D.C. Circuit concluded that courts should not address the merits of a PLRA claim until the prisoner has exhausted the act's administrative remedies completely.  *Id.* at 270.  But its analysis explained that a preliminary injunction may nonetheless be appropriate because

> [t]he Supreme Court has long recognized that federal courts possess a "traditional power to issue injunctions to preserve the *status quo* while administrative proceedings are in progress and prevent impairment of the effective exercise of appellate jurisdiction."  *FTC v. Dean Foods Co.,* 384 U.S. 597, 604 . . . (1966).  As we explained in *Wagner v. Taylor,* "[i]f [a] court may eventually have jurisdiction of the substantive claim, the court's incidental equitable jurisdiction, despite the agency's primary jurisdiction, gives the court authority to impose a temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review."

*Id.* at 268.  *Jackson* analyzed the PLRA's language in this light, finding that the act's exhaustion requirement

> contain[ed] nothing expressly foreclosing courts from exercising their traditional
> equitable power to issue injunctions to prevent irreparable injury pending
> exhaustion of administrative remedies. The district court therefore had no need to
> recognize an irreparable injury exception to the PLRA's exhaustion requirement;
> the court had inherent power to protect the prisoners while they exhausted prison
> grievance procedures.

*Id.* at 268. Thus, the D.C. Circuit viewed a court's ability to issue a preliminary injunction pending administrative review as something technically separate from the exhaustion requirement, but still appropriate only when necessary to prevent irreparable injury. *See id.* at 267–68.

*Wagner* is similar. Analyzing Title VII's exhaustion requirement, it held that Title VII does not expressly foreclose courts' "inherent equitable power to issue . . . injunctions to preserve the status quo." *Wagner*, 836 F.2d at 570–75. *Wagner* thus concluded that it retained jurisdiction to grant interim injunctive relief to prevent irreparable injury or retaliation. *Id.* at 571–574 ("If the courts are to be divested of . . . inherent equitable power to maintain the status quo . . . there must be clear evidence of congressional intent to do so.").

In sum, both *Jackson* and *Wagner* considered whether a provision mandating exhaustion effectively eliminated a court's ability to issue a status quo injunction. If the statute does not contain such an express limitation, they held, a court properly may issue a preliminary injunction to preserve the status quo.

### 3. *Kentucky v. United States ex rel. Hagel*

In *Kentucky v. United States ex rel. Hagel* ("*Hagel*"), the Sixth Circuit analyzed the RSA's provision mandating exhaustion to determine whether it eliminated an RSA plaintiff's capacity to seek injunctive relief from a federal court. 759 F.3d 588 (6th Cir. 2014). In that case, the Army had solicited a DFA services contract as a set aside for Small Business Administration Historically Underutilized Business Zones. *Id.* at 591. The state licensing

agency asserted that the RSA applied to the solicitation and initiated arbitration. *Id.* The state

licensing agency also sued in federal district court, requesting a preliminary injunction to stay an

award of a new contract pending arbitration. *Id.*

The district court dismissed the action for lack of jurisdiction. *Id.* at 595. It reasoned that

the state licensing agency, which had not yet exhausted arbitration available under the RSA,

could not seek judicial relief until it had done so. *Id.* The Sixth Circuit initially upheld this

dismissal. *Id.* (concluding that "[t]he district court did not abuse its discretion in denying the

preliminary injunction" because other courts have required exhaustion (internal quotation marks

omitted)). Later, however, the Sixth Circuit reversed that conclusion, holding that the state

licensing agency's "failure to seek and complete arbitration does not deprive the federal courts of

jurisdiction." *Id.* at 591–92. The Sixth Circuit deemed its previous decision affirming the

district court "not a model of clarity" and reconsidered its position in detail. *Id.* at 597.

Ultimately, it reached the opposite conclusion, holding "exhaustion is not a jurisdictional

prerequisite." *Id.* at 597.

The Sixth Circuit's rational is important. It reasoned that the Supreme Court "has

instituted a clear-statement rule requiring Congress to 'state[ ] [clearly] that a threshold

limitation on a statute's scope shall count as jurisdictional . . . .'" *Id.* at 597–98 (quoting

*Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006)). Analyzing the RSA's exhaustion

requirement under this clear-statement rule, *Hagel* concluded that the language of 20 U.S.C. §

107d-1 "is not phrased in jurisdictional terms" and thus does not provide a "clear statement" that

exhaustion is jurisdictional. *Id.* at 598.

Although the Sixth Circuit concluded that the exhaustion requirement is not

jurisdictional, it explained that failing to exhaust administrative remedies still may be "fatal to a

suit in federal court." *Id.* at 599.  Exhaustion requirements are meant to protect administrative

agency authority and promote judicial efficiency, so parties should not be allowed to disregard

the administrative procedures easily.  *See id.*  Instead, the Sixth Circuit concluded that courts

should exercise their discretion when deciding whether to excuse exhaustion under the RSA.  *See*

*id.*  In these situations, the Sixth Circuit held, district courts should examine whether an

exception to exhaustion—*i.e.*, irreparable harm, inadequate administrative remedy, or futility—

exists.  *Id.*

      *Hagel* also held "that exhaustion should have been excused because requiring the

completion of arbitration prior to filing in federal court for a preliminary injunction would likely

result in irreparable harm."  *Id.*  *Hagel* found irreparable harm existed because sovereign

immunity barred the arbitration panel or a federal court from awarding damages to the state

licensing agency if the Army had violated the RSA.  *Id.*  It thus held that the district court had

jurisdiction to consider and should not have dismissed the state licensing agency's request for an

injunction.  *Id.* at 600.  In short, *Hagel* held that the RSA requires exhaustion of the act's

arbitration remedy, but this exhaustion requirement is "non-jurisdictional" and excusable in

appropriate circumstances.

### 4.  *Johnson v. United States*

      Another RSA case, *Johnson v. United States*, No. EP-14-CV-00317-DCG, slip op. (W.D.

Tex. Sept. 12, 2014), followed *Hagel*'s approach.  In *Johnson*, the Army previously had awarded

a contract to the Texas state licensing agency to operate the Army's cafeteria facilities under the

RSA.  *Id.* at 2.  As the contract neared its expiration, the Army posted a solicitation for services

that was exclusively a small business set-aside and provided no RSA priority to blind persons.

*Id.* at 3.  The state licensing agency and its licensed blind vendor, Harvey Johnson, were

ineligible to bid on the solicitation.  *Id.*  And when they asked the Army to amend its solicitation

to comply with the RSA, it refused.  *Id.*  So, the state licensing agency initiated arbitration under

the RSA and also sued in federal court seeking injunctive relief pending the arbitration panel's

decision.  *Id.* at 3–4.  The Army asserted the same challenges that intervenors assert here—that

the district court lacked jurisdiction because:  (1) the Court of Federal Claims has exclusive

jurisdiction over procurement disputes; and (2) the district court lacks jurisdiction until

administrative remedies are exhausted.  *Id.*  But, the district court rejected both arguments.

As this court has concluded, *Johnson* held that the Court of Federal Claims did not have

exclusive jurisdiction over the dispute because the state licensing agency had claimed an RSA

violation and requested arbitration of that dispute.  *Id.* 8–9.  *Johnson* also held that the district

court had APA jurisdiction to review the arbitration panel's decision, and thus had incidental

jurisdiction to consider the state licensing agency's preliminary injunction request.  *Id.*

*Johnson* considered whether the state licensing agency was required to exhaust the RSA's

arbitration remedy before it could seek injunctive relief from the district court.  *See id.* at 9.  The

Army argued that administrative exhaustion was either a jurisdictional requirement or "a

mandatory jurisprudential requirement," *i.e.*, a non-jurisdictional requirement.  *Id.*  *Johnson*

rejected these arguments, explaining that the Supreme Court "has indicated that whether a statute

requiring plaintiffs to exhaust administrative remedies is either jurisdictional in nature or

jurisprudential depends on the intent of Congress as evinced by the language [it] used" in the act.

*Id.* (citing *Weinberger v. Salfi*, 422 U.S. 749, 756–67 (1975)).  It described the difference

between "jurisdictional" and "jurisprudential"/"non-jurisdictional" requirements in this fashion:

> If the arbitration provision in the RSA is a jurisdictional requirement, it deprives
> federal courts of jurisdiction to consider excusing a failure to exhaust
> administrative remedies . . . .  If the provision is a jurisprudential requirement . . .
> it merely codifies the common law exhaustion principle under which exhaustion

of administrative remedies is favored, but may be excused by a limited number of exceptions to the general rule.

*Id.* at 10 (internal citations omitted).

*Johnson*, relying on the Sixth Circuit's decision in *Hagel* and the analysis of the Supreme Court in *Salfi*, concluded that the RSA does not contain a clear statement from Congress that the RSA's arbitration provision is jurisdictional. *Id.* at 10–11. *Johnson* determined that "[t]he language of a statute must be 'sweeping and direct' for it to be considered jurisdictional." *Id.* (quoting *Salfi*, 422 U.S. at 757). Thus, an exhaustion requirement is not a jurisdictional prerequisite unless the statute's plain language "deprives federal courts of jurisdiction if administrative remedies are not exhausted." *Id.* at 11.

As an example, the court looked at *Salfi*'s analysis of the Social Security Act's exhaustion provision. *Id.* This provision was jurisdictional, *Salfi* held, because it "explicitly mentions and deprives all forums, including courts, of jurisdiction when administrative remedies are not fully exhausted." *Id.* at 10–11 (citing *Salfi*, 422 U.S. at 757–59, n.4 (further citations omitted)). *Salfi* analyzed 42 U.S.C. § 405(h), and used it to explain why that provision amounted to a jurisdictional requirement:

> The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. *No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.*

42 U.S.C. § 405(h) (emphasis added); *see Salfi*, 422 U.S. at 757–59. The Supreme Court focused on the italicized third sentence and, based on context, concluded that it was "more than a codified requirement of administrative exhaustion." *Salfi*, 422 U.S. at 757. The Supreme Court found the exhaustion requirement jurisdictional because: (a) the first two sentences of § 405(h)

33

already "assure that administrative exhaustion will be required;" and (b) the third sentence's sweeping language "states that no action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted." *Id.* at 757–59.

*Johnson* examined the RSA's language and found it to contain no clear statement requiring exhaustion as a jurisdictional prerequisite. *Johnson*, No. EP-14-CV-00317-DCG, slip op. at 11 (W.D. Tex. Sept. 12, 2014). *Johnson* held that the statute does not plainly "deprive[ ] federal courts of jurisdiction if administrative remedies are not exhausted," and thus concluded that the RSA's exhaustion requirement is a non-jurisdictional one. *Id.*

Still, and consistent with the Sixth Circuit's treatment in *Hagel*, the Texas federal district court in *Johnson* did not exercise jurisdiction over the preliminary injunction motion simply because the exhaustion requirement was non-jurisdictional. Instead, it recognized that administrative exhaustion is still a mandatory "condition precedent to bringing a claim." *Id.* at 11–12 (citing *Cent. States Se. & Sw. Areas Pension Fun v. T.I.M.E.-DC, Inc.*, 826 F.2d 320, 328 (5th Cir. 1987) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938))). And *Johnson* determined that the failure to exhaust might require a court to dismiss unless some exception excuses exhaustion. *Id.* at 12 (citing *Hagel*, 759 F.3d at 599–600). *Johnson* considered the common exceptions to exhaustion. *Id.* (citations omitted). And, like the Sixth Circuit in *Hagel*, *Johnson* found that requiring the state licensing agency to complete arbitration before seeking a preliminary injunction in federal court would produce irreparable harm. *Id.* The irreparable harm in *Johnson* arose from sovereign immunity barring—by arbitration or otherwise—an award of damages. *Id.* at 13. Thus, *Johnson* excused the state licensing agency

34

from exhausting the RSA's arbitration remedy before asking the district court to issue a status quo preliminary injunction.  *Id.* at 14.

The court finds *Hagel* and *Johnson* highly persuasive.  Non-jurisdictional exhaustion is presumed and jurisdictional exhaustion exists only where Congress has stated in clear terms that a court's jurisdiction is barred until the administrative proceedings are complete.  While the RSA contains an exhaustion requirement, the statute contains no clear statement eliminating a court's jurisdiction to issue a preliminary injunction.  Indeed, the RSA is like the PLRA's exhaustion requirement at issue in *Jackson* and Title VII's exhaustion requirement at issue in *Wagner*.  Each case concluded that the statutory exhaustion requirement was non-jurisdictional.

Neither is the court persuaded by intervenors' argument that other cases have found the RSA's arbitration provision to be a jurisdictional one.  *See* Doc. 37-1 at 11–12.  The Court of Federal Claims and the Federal Circuit in *Kentucky* analyzed whether the statute contained an exhaustion requirement or if arbitration was optional—and not whether the exhaustion requirement was jurisdictional or non-jurisdictional.  *See Kentucky*, 424 F.3d at 1227–29; *Kentucky*, 62 Fed. Cl. at 456–60.  While the state licensing agency also had requested a preliminary injunction, both courts focused on the RSA's arbitration provision and analyzed whether it allowed a court to decide the merits of the dispute.  *See id.* at 1224; *Kentucky*, 62 Fed. Cl. at 451.  And when the two *Kentucky* cases found that arbitration was "mandatory," *i.e.*, that the statute contained an exhaustion requirement, neither court considered whether the exhaustion requirement was jurisdictional or whether an injunction would be appropriate pending arbitration, as did *Hagel* and *Johnson*.  When the Court of Federal Claims addressed that question in *Colorado Department*, it concluded that, because the Court of Federal Claims lacks APA jurisdiction to review an RSA arbitration panel's decision, it also lacks the incidental

jurisdiction necessary to grant a preliminary injunction.  *See Colorado Department*, 74 Fed. Cl. at 347–349.  The Court of Federal Claims thus lacks jurisdiction to consider preliminary injunction requests pending the outcome of a RSA arbitration because it lacks jurisdiction to review an arbitration panel's decision—not because the RSA's exhaustion requirement is jurisdictional.  Indeed, *Colorado Department* summarized the Federal Circuit's holding in *Kentucky* as one mandating arbitration "before a court can exercise jurisdiction over [a plaintiff's *substantive claims*," and noted that "[e]ven when exhaustion would normally be required" there are exceptions to the exhaustion rule.  *Id.* at 345–46 (emphasis added) (recognizing that the exhaustion requirement of the RSA is non-jurisdictional).

Intervenors also rely on *Colorado v. United States*, 813 F. Supp. 2d 1230 (D. Colo. 2011), a case decided by another district court in the Tenth Circuit.  They cite this case as one supporting their contention that our court lacks jurisdiction to consider a status quo injunction. *Colorado* considered a district court's ability to enter a preliminary injunction in an RSA case, but, yet again, this case never concluded that the RSA's exhaustion requirement is a jurisdictional one.  Indeed, *Colorado* agreed that exceptions exist to "the general rule that exhaustion . . . is a prerequisite to judicial review" which might allow a district court to exercise jurisdiction.  *Id.* at 1234 n.2.  The court takes this observation as a tacit recognition that the RSA's exhaustion requirement is of the non-jurisdictional variety.

The court is mindful that *Colorado* dismissed the existence of any exception to exhaustion in a footnote and, instead, focused on plaintiffs' argument that the All Writs Act, 28 U.S.C. § 1651(a), provided the court with jurisdiction to consider injunctive relief pending arbitration.  *Id.* at 1233–34.  *Colorado* concluded that it could consider a status quo-preserving injunction under the All Writs Act's jurisdiction, but plaintiffs would have to meet a heightened

burden.  *Id.* at 1234–37.  Because plaintiffs could not meet the normal burden for irreparable

harm, let alone the heightened "virtual certainty of irreparable harm," the court concluded that

exercising jurisdiction to issue a preliminary injunction under the All Writs Act was not

appropriate.  *Id.* at 1237.  In short, *Colorado* never held that the exhaustion requirement was

jurisdictional.

Finally, intervenors rely on *Alabama Department of Rehabilitation Services v. United

States Department of Veterans Affairs*, 165 F. Supp. 2d 1262 (M.D. Ala. 2001).  But once again,

this case does not conclude that the RSA's exhaustion requirement is jurisdictional.  *See Ala.

Dep't of Rehab. Servs.*, 165 F. Supp. 2d 1262, 1270–75, 1270 n.4.  In that case, the district court

recognized that exhaustion of administrative remedies is generally required where Congress has

mandated exhaustion.  *Id.* at 1269.  Accordingly, it noted that a court generally should not grant

relief before exhaustion is complete and, instead, should dismiss the case.  *Id.*  But, the *Alabama*

court also found "there are some situations where judicial intervention in the administrative

process may be warranted" and the court could exercise discretion and excuse exhaustion.  *Id.* at

1270.  And the court proceeded to consider whether any "special circumstances" existed that

provided it with authority to grant the requested preliminary injunction.  *Id.* at 1270 n.4, 1271–75

(explaining that *Weinberger*'s "discussion of possible exceptions to the exhaustion rule" was

*dicta* "to the extent that it may imply the act's arbitration provisions are not mandatory" but the

court nevertheless "assumed that exceptions [might] apply" and addressed them).  So, *Alabama

Department* also treated the RSA's exhaustion requirement as non-jurisdictional and examined

whether any exceptions existed excusing exhaustion.

In closing, because neither one of the original parties in this case made the jurisdictional

arguments now asserted by intervenors, the court has reconsidered the preliminary injunction

request under Fed. R. Civ. P. 65 and the preliminary injunction test normally used in our Circuit. Intervenors have cited no cases holding that the RSA's exhaustion requirement is a complete jurisdictional bar.  The RSA contains no clear statement eliminating our court's jurisdiction to consider the status quo preliminary injunction request Kansas makes here and the court thus concludes that the RSA's exhaustion requirement is non-jurisdictional.  The court therefore had discretion to excuse exhaustion and consider Kansas' preliminary injunction motion, if an exception to exhaustion exists.  As the original Memorandum and Order explained, the court has concluded that an exception does exist—irreparable harm—and it issued the injunction for that reason.  *See* Doc. 28 at 14–18 (Preliminary Injunction Memorandum and Order discussing Kansas' showing of irreparable harm).  That result is consistent with *Hagel*, *Johnson*, and the weight of the persuasive authority.

### D.  Subject Matter Jurisdiction Conclusion

For reasons explained above, the court concludes that the Court of Federal Claims does not have exclusive jurisdiction over this dispute.  Instead, any Court of Federal Claims Tucker Act jurisdiction is preempted because Kansas properly initiated arbitration asserting an RSA violation.  Our court had (and has) jurisdiction to consider Kansas' preliminary injunction motion because it has APA jurisdiction to review appeals from the decision of an RSA arbitration panel and an exception to the non-jurisdictional exhaustion requirement, irreparable harm, exists here.  The court thus denies intervenors' Motion to Dismiss for Lack of Jurisdiction.

### IV.  Motion to Alter, Amend, or Vacate

Having addressed the jurisdictional issues raised by intervenors, the court now turns to intervenors' other challenges to the injunction.  This collection of arguments assert that the court must alter, amend, or vacate its preliminary injunction under Fed. R. Civ. P. 59(e) because it:

(A) did not apply the heightened standard required for a disfavored preliminary injunction; (B) did not apply the heightened standard required for relief pending agency action under the All Writs Act; and (C) committed clear error by disregarding the 2015 NDAA Joint Explanatory Statement.  As explained below, the court concludes that it applied the correct burden for a preliminary injunction and thus declines to alter, amend, or vacate the injunction.

### A.   Heightened Standard for Disfavored Preliminary Injunctions

Intervenors argue, first, that the preliminary injunction issued here is a "disfavored" type of injunction, requiring Kansas to meet a heightened burden, which, they contend, Kansas has not met.  *See* Doc. 37-1 at 12–16.  Our Circuit recognizes three types of disfavored preliminary injunctions:  "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).  When a preliminary injunction is a disfavored one, the movant cannot rely on the Tenth Circuit's "modified-likelihood-of-success-on-the-merits standard" and, instead, "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."  *Id.* at 975–76; *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005).  The standard governing such disfavored injunctions also requires the court to scrutinize the preliminary injunction more closely "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."  *Id.* at 975.

Intervenors contend that the "injunction requested by Kansas is disfavored on all three fronts, and Kansas has not (and cannot) meet the heightened standard."  Doc. 37-1 at 15.  The court addresses each type of disfavored injunction, below.

### 1. Status Quo Altering Preliminary Injunctions

First, intervenors contend that the preliminary injunction disrupted the status quo because Kansas' contract with the Army expired on February 29, 2016, and the Army planned to move forward with procurement of the services from Lakeview under the JWOD Procurement List beginning March 1, 2016.  They argue that the preliminary injunction "improperly stripped a contract from Lakeview" and awarded it to Kansas.  *Id.* at 12–13.  And they assert that the court only can prohibit an unlawful contract award; it cannot enjoin lawful awarding of a contract that is on the JWOD Procurement List or mandate a directed award.  *Id.* at 13.  Essentially, intervenors argue that to maintain the "status quo," the court should have allowed the existing contract to expire on February 29 and permitted the Army to procure the services from the Procurement List beginning March 1.  The court disagrees with intervenors' characterization of the injunction.

"[T]he status quo is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'"  *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (quoting *SCFC ILC, Inc. v. Visa, USA Inc.*, 936 F.2d 1096, 1100 n.8 (10th Cir. 1991)).  It is not the status "immediately preceding the litigation" because that approach would allow any party opposing a preliminary injunction to create a new status quo and impose a heightened burden "merely by changing its conduct toward the adverse party."  *Id.*  "In determining the status quo for preliminary injunctions, [ ] court[s] look to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."  *Id.*

Here, the preliminary injunction preserved the last peaceable, uncontested status before the dispute developed.  This status existed when Kansas provided DFA services to the Army

under the RSA contract, regardless of whether it is legally entitled to priority for a new contract. *See Schrier*, 427 F.3d at 1257–60 (holding that reinstating plaintiff as Chair of the Department of Medicine would preserve the status quo and not constitute a disfavored injunction because the last uncontested status between the parties was when plaintiff was still Chair, "regardless of whether or not [plaintiff] [was] legally entitled to such reinstatement"); *Navajo Health Found.— Sage Mem'l Hosp., Inc. v. Burwell*, 100 F. Supp. 3d 1122, 1169–71 (D.N.M. 2015) (applying the traditional preliminary injunction factors after concluding that the status quo was continuing the agreement under the terms of the expired contract because such an injunction would not compel defendant to do something that it was not already doing in the years before the dispute arose); *see also Red Robin Int'l, Inc. v. Lehigh Valley Rest. Grp., Inc.*, No. 15-cv-02602-REB, 2016 WL 705988, at *1–3 (D. Colo. Feb. 23, 2016), *appeal docketed*, No. 16-1071 (10th Cir. Mar. 9, 2016) (considering a dispute over a contract renewal and holding that the status quo existed when defendant was operating as a Red Robin through the end of the original franchise agreement, despite Red Robin's arguments that the franchise agreement had since expired and defendant was infringing on its trademark). *But cf. Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1084–85,1098–99 (10th Cir. 2003) (concluding that it would disrupt the status quo to allow plaintiff to continue as manager past expiration of the parties' management contract while it tried to purchase defendants' assets under a separate option contract because, when the parties entered into the two separate contracts, the option contract's terms did not provide plaintiff purchase rights until the day after the management contract expired). The court's preliminary injunction stopped the parties, in place, where they were before Kansas filed suit. It serves to protect Kansas from irreparable harm while the arbitration panel decides if the

Army has violated Kansas' RSA rights.  The court thus need not apply a heightened burden because its injunction preserved, not altered, the status quo.

Intervenors' arguments that the injunction improperly stripped the contract from Lakeview and awarded it to Kansas as a "directed award" are premature.  The injunction holds the parties in place while the DOE's arbitration panel decides whether the Army violated the RSA.  The court has not decided the merits of the dispute or directed the Army to award a DFA services contract to Kansas.  Instead, the injunction leaves the existing relationship in place in the interim, and, if the Army wins at arbitration, then it is free to award that contract to any lawful recipient under any lawful process.  But if the Army loses the arbitration proceeding, and the panel determines the RSA applies to this bundle of services, Kansas would have a right to the contract so long as its bid is within the competitive range and ranked among those proposals with a reasonable chance of being selected for final award.  The RSA expressly guarantees it such priority.  *See* 20 U.S.C. § 107a(a)(5); 34 C.F.R. § 395.33(a)–(b).  So, unlike a normal bid protest, Kansas not only would have a "substantial chance" of receiving the contract award, but it likely would receive contract award if it met the RSA's criteria.  *See Wash. State Dep't of Servs. for the Blind*, 58 Fed. Cl. at 785; *Miss. Dep't of Rehab. Servs. v. United States*, 61 Fed. Cl. 20, 25–26 (2004); *see also* Doc. 28 at 17 (explaining that "Kansas' previous bids were competitive and the Army awarded the contracts to Kansas").  And the RSA's regulations would require the Army to bring itself into compliance with this act's priority designations.  *See* 34 C.F.R. § 395.37(d) (explaining that if the arbitration panel decides the federal agency has violated the RSA "the head of any such department, agency, or instrumentality . . . shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the

decision of the panel").  Until arbitration is concluded, the preliminary injunction's purpose is merely to continue the status quo.  It does not amount to a directed award.

### 2.  Mandatory Preliminary Injunctions

Next, intervenors contend that the injunction is a mandatory preliminary injunction "because it has the direct effect of requiring the Army to secure DFA services under the RSA, even though the Army had taken steps to procure the services from Lakeview under the Procurement List . . . ."  Doc. 37-1 at 15.

A mandatory preliminary injunction is "an injunction that requires the nonmoving party to take affirmative action . . . before a trial on the merits occurs."  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citation omitted) (discussing mandatory preliminary injunction which ordered defendant to transfer record title of all interests, properties, and assets held by defendant to plaintiff).  Mandatory injunctions "'affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction."  *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 633 F. Supp. 2d 1257, 1269 (D.N.M. 2008) (quoting *SCFC ILC, Inc.*, 936 F.2d at 1099).  But the nature of any injunction requires the nonmovant to act in some particular fashion, and not all injunctions are mandatory.  For example, the injunction issued in *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.* required EchoStar to continue activating new Dominion subscribers on the same terms and conditions it previously had used for other customers.  269 F.3d at 1155.  But this restraint did not make the injunction a mandatory one because it "did not compel EchoStar to do something that it was not already doing during the last uncontested period preceding the injunction."  *Id.*

Yet, some injunctions preserving the status quo—*i.e.*, the last uncontested moment—can have a mandatory effect. *See Schrier*, 427 F.3d at 1260 (explaining that "[t]he distinction between mandatory and prohibitory injunctions . . . cannot be drawn simply by reference to whether or not the status quo is to be maintained or upset" (internal quotation and citation omitted)).  Differentiating mandatory injunctions from other injunctions requires courts to consider "whether the non-moving party is being ordered to perform an act, or refrain from performing" one. *Id.* (internal quotation and citation omitted). "'In many instances, this distinction is more semantical than substantive.  For to order a party to refrain from performing a given act is to limit its ability to perform any alternative act . . . .'" *Id.* (quoting *O Centro Espirita*, 389 F.3d at 1006 (further quotation omitted)).  Thus, determining whether an injunction is mandatory or prohibitory is not a simple exercise. *O Centro Espirita*, 389 F.3d at 1006.

Here, the court concludes its preliminary injunction is prohibitory, not mandatory.  The injunction temporarily prohibits the Army from procuring the DFA services in a way other than it had done in the past. *See Dominion Video Satellite, Inc.*, 269 F.3d at 1155.  The court entered this injunction while Kansas was still providing the services to the Army and the injunction does not require the Army to do something it was not already doing. *See Schrier*, 427 F.3d at 1259–61 (finding an injunction was mandatory where the defendant already had removed plaintiff as Chair of the Department of Medicine and appointed an interim Chair because the injunction would require the defendant to act affirmatively to reinstate plaintiff and would require ongoing supervision by the court); *Evans v. Fogarty*, 44 F. App'x 924, 928–29 (10th Cir. 2002) (concluding that an injunction was prohibitory, not mandatory, even though it directed defendants, who already had required plaintiffs to start submitting manual billing records, to permit plaintiffs to return to electronic billing because this "does not require defendants to do

44

something that they were not doing in the last uncontested period"); *Navajo Health Found.—Sage Mem'l Hosp., Inc.*, 100 F. Supp. 3d at 1169–71 (concluding that a preliminary injunction requiring the parties to continue operating under the terms of an expired contract was not mandatory because it did not impose any additional duties on the defendant beyond what the contract had required and there was a "negligible chance" that the court would have to supervise the injunction). The injunction here requires the Army to refrain from switching its procurement to one made under the JWOD until arbitration is completed. *See Schrier*, 427 F.3d at 1260 (discussing the difference between an order to perform an act and an order to refrain from acting). And, it is unlikely that the court will have to supervise the injunction. *See Navajo Health Found.—Sage Mem'l Hosp., Inc.*, 100 F. Supp. 3d at 1170 (noting that "[t]he most important factor in determining whether a preliminary injunction is mandatory . . . is the . . . chance that the Court will" have to supervise the injunction and explaining that it is especially unlikely that enforcement will place a heavy burden on the court when the party enjoined is the federal government). In sum, the court concludes that preserving the status of the last peaceable moment is prohibitory, not mandatory, and thus does not warrant a heightened burden.

### 3. Preliminary Injunctions that Afford All the Relief Sought

Last, intervenors argue that the injunction affords Kansas all the relief it could recover at a trial on the merits. Docs. 37-1 at 15; 51 at 9. This is a fanciful proposition. The injunction awards Kansas temporary relief while the arbitration panel proceeds to determine if an RSA violation has occurred. Kansas has not received all the relief it could receive from the arbitration trial on the merits of Kansas' claim. If Kansas prevails at arbitration, it stands to recover something more than the preliminary injunction awards.

Because the preliminary injunction in this case did not disrupt the status quo, was not mandatory, and did not afford Kansas total relief, the heightened standard of review required for disfavored injunctions was unnecessary.

## B.  Heightened Standard for Relief Pending Agency Action

Intervenors' next series of arguments contend that the court should have evaluated Kansas' injunction request under a heightened preliminary injunction because the court issued injunctive relief pending final agency action.  *See* Doc. 37-1 at 16–18.  According to intervenors, because the RSA does not expressly grant authority to enter injunctive relief pending arbitration, the court's only authority to do so arises from the All Writs Act, 28 U.S.C. § 1651(a).[12] Intervenors assert that an injunction issued under this act requires a heightened burden.  *See* Doc. 37-1 at 16.

Intervenors' basis for this argument is the decision in *Colorado v. United States*, 813 F. Supp. 2d 1230 (D. Colo. 2011), addressed briefly above during the discussion of intervenors' arguments that the RSA's exhaustion requirement was jurisdictional.  *See supra* part III.C.  In *Colorado*, the district court held that it could consider a status-quo preserving injunction under the All Writs Act, but plaintiffs would have to meet a heightened burden.  *Colorado*, 813 F. Supp. 2d at 1234–37 (concluding that the state licensing agency would have to show "a virtual certainty of irreparable harm" because the court's "review jurisdiction [was] not in jeopardy and Congress ha[d] not evidenced an intent to permit a status quo injunction").  *Colorado* also mentioned that an exception to exhaustion might apply—and thus permit the court to exercise

---

[12]     "The All Writs Act empowers the federal courts to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'"  *Colorado*, 813 F. Supp. 2d at 1234 (quoting 28 U.S.C. § 1651).  "This expansive grant of authority includes a limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through prescribed channels."  *Id.* (internal quotation marks and citation omitted).

jurisdiction—but it dismissed the existence of any exceptions in a footnote and, instead, focused on whether it could grant injunctive relief pending arbitration under the All Writs Act.  *Id.* at 1233–34, n.4.  In short, the *Colorado* plaintiffs failed to meet their burden under either test for preliminary relief because they could not meet the normal burden—let alone the heightened burden applicable under the All Writs Act standard.  *Id.* at 1237.

Unlike *Colorado*, the court here already has concluded that an exception to the non-jurisdictional exhaustion requirement exists because Kansas has shown it will sustain irreparable harm without an injunction.  Thus the court need not apply the alternative All Writs Act analysis to adjudicate a request for injunctive relief and need not apply the heightened burden that applies to injunctions requested under that act.  This analysis tracks the approach used by the Sixth Circuit in *Hagel* and the Texas district court in *Johnson*.  *See Kentucky v. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014) (discussing the traditional preliminary injunction factors and directing the district court to consider whether injunctive relief is appropriate); *Johnson v. United States*, No. EP-14-CV-00317-DCG, slip op. at 14–17 (W.D. Tex. Sept. 12, 2014) (analyzing the request for a preliminary injunction under the traditional preliminary injunction factors); *see also Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 110 (D.C. Cir. 1986) (discussing, albeit in *dicta*, a plaintiff's capacity to seek a preliminary injunction pending arbitration under the RSA and explaining that, "had the parties sought a preliminary injunction pending arbitration, [the court's] decision on the motion would have been under the same irreparable injury standard applied by the [d]istrict [c]ourt in determining not to require exhaustion[,]" *i.e.* the traditional, not heightened burden).

Intervenors also invoke several other cases as support for their proposition that the court could grant an injunction only under the All Writs Act—and thus the court should have applied

the heightened burden associated with that act.  *See* Doc. 37-1 at 16–17.  The court does not

agree with intervenors' characterization of these cases.

For instance, intervenors cite *V.N.A. of Greater Tift Cty., Inc. v. Heckler*, 711 F.2d 1020

(11th Cir. 1983).  But there, the Eleventh Circuit viewed the statutory scheme at issue—the

Medicare Act—to include an exhaustion requirement that was jurisdictional in character.  *Id.* at

1024–27 (citing *Salfi*, 422 U.S. at 757, as authority for this conclusion).  Because a jurisdictional

requirement imposed expressly by Congress cannot be waived, the Eleventh Circuit held that

plaintiff could not use federal question jurisdiction as the basis for a preliminary injunction. *Id.* at

1024, 1026.  So, plaintiff alternatively invoked the All Writs Act, contending that it provided the

district court with authority to issue an injunction pending the outcome of the underlying

administrative proceeding.  *Id.* at 1027.  The Eleventh Circuit agreed with plaintiff's alternative

theory.  *Id.* at 1027–30.

The court views *V.N.A.* as authority for the proposition that the All Writs Act supplies an

alternative basis to entertain an injunction request—even when Congress has included an

exhaustion requirement that is jurisdictional in nature.  But *V.N.A.* does not hold—as intervenors

contend—that federal district courts must apply the All Writ's Act's heightened burden standard

every time a plaintiff asks for an injunction to preserve the status quo pending the outcome of an

administrative proceeding.  Here, no clear statement in the RSA (or its regulations) suggests that

Congress intended to prohibit judicial involvement with a status quo preserving injunction.

Intervenors have failed to persuade the court that these cases require a heightened burden.

## C.  Consideration of the 2015 NDAA Joint Explanatory Statement

Finally, intervenors argue that the court "committed clear error [by] disregarding the

2015 National Defense Authorization Act's ('NDAA') Joint Explanatory Statement.  Doc. 37-1

48

at 4.  They assert that the court "broke from binding precedent by failing to give any weight, must less appropriate weight" to the 2015 NDAA and Joint Explanatory Statement, which they assert is "compelling evidence of Congressional intent" that establishes conclusively that the JWOD applies to the disputed contract.  Doc. 37-1 at 19.  They cite Supreme Court and Tenth Circuit precedent that find purportedly comparable documents as "persuasive legislative history."  *Id.* at 20 (citing *R.R. Comm'n of Wis. v. Chi., Burlington, & Quincy R.R. Co.*, 257 U.S. 563, 589 (1922) ("Committee reports and explanatory statements of members in charge made in presenting a bill for passage" are "admissible to solve doubt"); *Anderson v. City of Albuquerque*, 690 F.2d 796, 800 (10th Cir. 1982) (relying on "Joint Explanatory Statement of Managers at the Conference on H.R. 1746").

The problem with intervenors' argument is a simple one:  the court did not disregard the Joint Explanatory Statement.  To the contrary, it considered the Joint Explanatory Statement in close detail.  It considered other interpretations of the Joint Explanatory Statement, and how it affected the likelihood that Kansas would succeed on the merits at arbitration.  *See* Doc. 28 at 27–33.  To summarize what the court said earlier, the Joint Explanatory Statement directed that regulations be developed to clarify the confusion between the RSA and the JWOD.  But, because those regulations had not been promulgated and might not take the form that the Army (and now, intervenors) imagine, the court determined that a preliminary injunction was appropriate.  Instead of reiterating the detailed consideration given the Joint Explanatory Statement and its previous conclusion, the court directs intervenors to its earlier analysis.  *See* Doc. 28 at 27–33.

Finally, intervenors recently notified the court of what they called "supplemental authority" about the 2015 NDAA and Joint Explanatory Statement.  Intervenors provided a proposed rule issued by the Department of Defense (DoD), as published for comment in the

49

*Federal Register*.  The gist of intervenors' supplemental submission is that the DoD now has published proposed regulations and this solidifies its contention that this is a JWOD procurement under the Court of Federal Claims' exclusive jurisdiction, or alternatively, that this changes the balance on the court's analysis of the likelihood of success element of the preliminary injunction analysis.  It does not.

For one thing, no new regulations have issued.  Only proposed regulations have issued. As the court explained in its Memorandum and Order, many steps remain in the pathway to final regulations.  *See* Doc. 28 at 31–33; Doc. 20-12.  To assume that the current proposal will become the final version ignores those remaining steps and assumes that they do not matter.

For another, and even if the proposed regulations eventually become the final version, they do not nullify a central legislative reality.  The RSA directs the Secretary of the Department of Education—and not the DoD—to prescribe regulations interpreting RSA priority.  *See* 20 U.S.C. § 107(b) ("[T]he Secretary [of the DOE], through the Commissioner, shall, after consultation with the Administrator of General Services and other heads of departments, agencies, or instrumentalities of the United States in control of the maintenance, operation, and protection of Federal property prescribe regulations . . . .").  By statute, the entire Congress passed and the President signed a bill assigning jurisdiction over any state licensing agency's claim that an RSA violation has occurred to an arbitration panel convened by the Secretary of the DOE.  The court is not persuaded that one member of the House and one Senator can give the DoD authority to issue regulations interpreting RSA priority or eliminating its arbitration jurisdiction.

### D.  Non-jurisdictional Challenges Conclusion

In sum, the court concludes that a heighted burden was not necessary for the preliminary injunction issued here.  And the court concludes it did not commit clear error with respect to the 2015 NDAA and Joint Explanatory Statement.

### V.   Conclusion

The Court of Federal Claims does not have exclusive jurisdiction over the dispute presented here.  And, because the RSA's exhaustion requirement is non-jurisdictional, this court had discretion to excuse exhaustion and consider the preliminary injunction request because an irreparable harm exception to exhaustion exists.  The court also applied the appropriate legal standard for issuing an injunction here and gave proper consideration to the 2015 NDAA Joint Explanatory Statement.  The court thus denies intervenors' Motion to Dismiss for Lack of Jurisdiction and Motion to Alter, Amend, or Vacate Preliminary Injunction (Doc. 37).

If intervenors can show that changed circumstances nullify Kansas' capacity to prevail on all four preliminary injunction factors identified by our Circuit, they may renew their motion.  In the absence of such a development or other appropriate action, however, the preliminary injunction entered on February 26, 2016 will remain in effect.[13]

---

[13]       The court makes one other observation about the duration of its preliminary injunction.  Where the duty to arbitrate arises from a contract, our Circuit has held that district courts may issue a status quo injunction that lasts long enough for the aggrieved party to present its request for injunctive relief to the arbitrator.  *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 726, 727–28 (10th Cir. 1988).  This is so because arbitration-by-agreement typically provides the arbitrator with broad authority, including the power to issue temporary injunctive relief.  *See id.*; *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993) (recognizing the power of district courts to enter temporary relief preserving the status quo until the arbitration panel "can enter whatever temporary injunctive relief that it deems necessary to maintain the status quo").  But here, the duty to arbitrate RSA claims arises from an act of Congress and, it seems, that act does not convey authority to issue temporary injunctive relief. *See Ga. Dep't of Human Res. v. Nash*, 915 F.2d 1482, 1492 (11th Cir. 1990) (explaining that the RSA's terms provide the arbitration panel only the limited authority to determine that a violation is occurring, but no authority to order the federal entity to take remedial action).  The court thus issued an injunction lasting until the arbitrated dispute is decided on its merits.

**IT IS ORDERED BY THE COURT THAT** Kansas' Motion for Leave to File Its Sur-Reply Brief (Doc. 55) is granted.  Within seven (7) calendar days of the date of this Order, Kansas shall file its Surreply (Doc. 55-1) as a separate docket entry in this case.

**IT IS FURTHER ORDERED THAT** intervenors SourceAmerica and Lakeview Center, Inc.'s Motion to Dismiss for Lack of Jurisdiction and Motion to Alter, Amend, or Vacate Preliminary Injunction (Doc. 37) is denied.

**IT IS SO ORDERED.**

**Dated this 24th day of June, 2016, at Topeka, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**